FILED
2010 OCT 5 P 4:21
CLERK
U.S. BANKRUPTCY
COURT - PGH

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In Re:

| | | |
|---|---|---|
| SHARON DIANE HILL, | : | Case Number 01-22574 JAD |
| Debtor, | : | Chapter 13 |
| | : | |
| ROBERTA A. DeANGELIS, | : | Related to Doc. No. 465 |
| Acting United States Trustee | : | |
| for Region 3, | : | |
| Movant, | : | |
| | : | |
| v. | : | |
| | : | |
| COUNTRYWIDE HOME LOANS, | : | |
| INC., GOLDBECK, McCAFFERTY | : | |
| AND McKEEVER, and | : | |
| ATTORNEY LESLIE PUIDA, | : | |
| Respondents. | : | |

*Appearances:*      Patrick S. Layng, Esq., United States Trustee
Lisa D. Tingue, Esq., for United States Trustee
Norma Hildenbrand, Esq., for United States Trustee
Thomas A. Connop. Esq., for Countrywide Home Loans, Inc
Dorothy A. Davis, Esq., for Countrywide Home Loans, Inc.
Francis Manning, Esq., for Goldbeck, McCafferty and McKeever/Atty Leslie Puida

## MEMORANDUM OPINION AND ORDER

Presently under consideration by the Court is a ***Rule to Show Cause Order*** ("Rule")

issued by the Court on July 29, 2009, at Document No. 465, by which the Respondents were directed

to establish cause as to why they should not be subject to "public censure, monetary sanctions,

restrictions on the right to appear before this Court or any combination thereof" for seven,

specifically identified areas of potentially sanctionable conduct.[1]

---

[1]      The Court's jurisdiction to hear and determine the *Rule to Show Cause* it issued arises under *28 U.S.C. §§ 1334* and *157* as well as the inherent power of the federal courts which includes *11 U.S.C. §105.* This is a core matter pursuant to *28 U.S.C. §157(b)(2)(A)*. This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to *Fed.R.Bankr.P. 7052* made applicable to contested matters pursuant to *Fed.R.Bankr.P. 9014.*

1

The *Rule* arises from the allegation by the UST in her *Amended Motion for Rule to Show Cause*, Document No.236, that the Respondents engaged in sanctionable conduct with respect to post-discharge collection efforts on a mortgage loan obligation of Sharon Hill, the Chapter 13 Debtor. There is a dense factual background that must be considered by the Court in reaching a decision on whether sanctions should be imposed. Before turning to a detailed review of the facts, however, it may be beneficial to provide a thumbnail sketch of the event that more than anything else caused a seemingly routine post-discharge dispute to snowball into an involved proceeding that has been ongoing for several years in this Court.

The event in question occurred on December 20, 2007, during a hearing on a *Motion to Enforce Discharge,* Document No. 59 ("Motion to Enforce"), which the Debtor had filed against her mortgage servicer, Respondent Countrywide Home Loans, Inc. ("Countrywide"), on June 25, 2007. The *Motion to Enforce* alleged that the Debtor's mortgage to Countrywide had been brought current during the course of her 60-month Chapter 13 plan, as evidenced by a March 9, 2007 Order, Document No. 46, ("Cure Order") issued after the completion of the plan. The *Motion to Enforce* further alleged that as soon as the Chapter 13 Trustee completed making payments in the case, the Debtor herself seamlessly began making regular monthly payments due under the mortgage to Countrywide to keep it current. Despite that, shortly after the discharge, Countrywide began attempting to collect on the mortgage and asserted that the Debtor was more than $4700 in arrears on the mortgage.

At the time the *Motion to Enforce* was filed, the Hill case was assigned to the Honorable Jeffery A. Deller and he held several hearings on the *Motion to Enforce*, continuing the

matter in each instance at the request of the Parties. On November 19, 2007, responsibility for deciding the *Motion* was transferred to the Undersigned as part of an overall consolidation and assignment of some matters involving Countrywide and its practices in a number of cases within this District. *See* Document Nos. 86, 88, 90, 94 and 96. *See also* Misc. Nos. 07-00203-TPA and 07-00204-TPA. Following this reassignment, the December 20, 2007 hearing was the Undersigned's first opportunity to consider the *Motion to Enforce*.

Prior to the hearing the Court reviewed the relevant pleadings and it quickly became apparent that the *Motion to Enforce* might become far more involved than could have been reasonably anticipated based solely on a cold reading of the documents. The first person to speak, Debtor's Counsel Julie Steidl ("Ms. Steidl")[2], made a rather startling announcement. In reviewing the file in preparation for the hearing she had discovered that a photocopy of a payment change letter that had been produced by Countrywide in discovery (one of three such letters) that appeared on its face to be a letter dated September 22, 2003 from Countrywide to the Debtor, with a copy shown going to the Chapter 13 Trustee and to Debtor's counsel, indicated an address for Counsel's office at "Suite 2830 Gulf Tower, 707 Grant Street," Pittsburgh, PA. That was puzzling to counsel – and the Court as well – because Ms. Steidl reported that on September 22, 2003 the office was still located at 210 Grant Street; Counsel's office did not move to the present "707 Grant Street" address until October 27, 2003. Countrywide's counsel, Leslie Puida ("Puida"), one of the Respondents here, replied that the Payment Change Letters had not been held out as genuine, but were merely

---

[2] In this Opinion the Court will generally use the full name the first time a person is mentioned and use only the last name thereafter, with two exceptions. First, both Julie Steidl and her law partner and husband, Ken Steidl, represented the Debtor, so they will be referred to as "Ms. Steidl" and "Mr. Steidl" to avoid confusion. Second, there was a Countrywide employee named Kimberly Hill (no relation to Debtor), so her full name will always be used.

a convenient vehicle to show payment changes that had occurred in the mortgage over the years. Nevertheless, there were enough questions raised by the Letters and Counsel's explanation of them that the Court permitted discovery, and ultimately issued the *Rule* which was the subject of the trial.[3]

This *Opinion* will begin with findings of fact and then move into a legal discussion, wherein any further factual amplification will be made as necessary. For the reasons that follow, the *Rule* will be vacated with respect to the first three of the "counts" directed against Countrywide, but sanctions will be imposed as to the fourth count. As to Goldbeck, McCafferty and McKeever ("GMM") and Puida, the Court finds that the *Rule* should be vacated with respect to the first count directed against them, but that sufficient evidence exists which require the imposition of sanctions the remaining two counts of the *Rule*. Therefore, a further hearing will be scheduled as to those Respondents limited to the issue of an appropriate sanction.

## FACTS

Roberta A. DeAngelis is the acting United States Trustee for Region 3 ("UST"). Countrywide is incorporated under the laws of the State of New York and maintains its principal place of business in California. At all relevant times Countrywide was a servicer of consumer mortgages in the United States. GMM was, and is, a law firm with a business address of Suite 5000 Mellon Independence Center, 701 Market Street, Philadelphia, Pennsylvania. Puida is an attorney licensed to practice law in the Commonwealth of Pennsylvania. She is employed by GMM and is admitted to practice before the United States District Court for the Western District of Pennsylvania.

---

[3]     *See* Page 26 of this *Opinion* for the specific Items of inquiry as set forth in the *Rule*.

GMM is primarily owned by two partners, attorney Michael McKeever and attorney Gary McCafferty, with each owning 47% of the firm, and the rest owned by others, including Puida, who owns 1%. As explained further below, GMM and Puida represented Countrywide at all relevant times herein in connection with the matters involving the Debtor.

On March 19, 2001, the Debtor, appearing *pro se*, filed a voluntary Chapter 13 Petition in the United States Bankruptcy Court for the Western District of Pennsylvania. On or about April 16, 2001, National City Mortgage Company ("National City") filed a proof of claim asserting a $7,210.89 arrearage on the Debtor's home mortgage. The mortgage and note was a fixed rate loan, so principal and interest never changed. At some time around June, 2001 the Debtor retained attorney Kenneth Steidl ("Mr. Steidl") to represent her. On June 15, 2001, Mr. Steidl filed an *Amended Plan* on behalf of the Debtor (Doc. No. 12). Under the terms of the *Amended Plan*, the Debtor proposed to pay National City, an estimated amount of $7,930 over 45 months to cure her pre-petition mortgage arrearage, together with her post-petition mortgage payments. National City did not object to the *Amended Plan*.

An *Order Confirming Plan as Modified* ("Confirmation Order") was entered on July 3, 2001 (Doc. No. 14), which provided, *inter alia*, that "[a]ny creditor whose payment changes due to variable interest rates, change in escrow, or change in monthly payment shall notify Trustee and the Debtor at least 20 days prior to the change taking effect." This language is consistent with this Court's Chapter 13 Procedure #9, which became effective July 1, 2004, and states:

> All notices of postpetition monthly payment changes must be served on the debtor, debtor's counsel and the Trustee. This applies not only to the mortgage changes but to any monthly payment currently being paid by the Trustee. Service of such a notice shall not be construed as a violation of the automatic stay.

Thereafter, the Debtor made her regular plan payments to the Chapter 13 Trustee. The Trustee then disbursed plan payments in accordance with the *Amended Plan* including the required payments to National City.

On June 23, 2003, a *Notice of Transfer of Claim* was filed with the Court, stating that the Debtor's loan was being transferred from National City to Countrywide effective July 1, 2003. On June 25, 2003, a few days prior to Countrywide acquiring the Debtor's loan, the Chapter 13 Trustee made a payment, check # 0374360, in the amount of $971.74 to National City. This payment was not credited to the Debtor by National City prior to the transfer of the loan to Countrywide on July 1, 2003. Upon transfer of the Hill loan, Countrywide failed to account for all of the *Amended Plan* payments previously made to National City by the Trustee. Countrywide's loan history only reflected that Debtor's post-petition mortgage payments were paid through March 2003 (due for April 2003), rather than June 2003 (due for July 2003). Upon acquisition of the loan Countrywide was therefore wrong in the paid-through date by three months.

Under Countrywide's internal procedures, when a loan is in bankruptcy, it is the responsibility of a case technician in Countrywide's Bankruptcy Department to order an escrow analysis on an annual basis. The escrow analysis is completed by the Escrow Department and a report is sent to an assistant manager and manager in the Bankruptcy Department where any necessary payment change letters are supposed to be generated. On October 22, 2003, Countrywide audited the Chapter13 Trustee's website as to the Debtor's loan and discovered that check # 0374360 had not been applied to the Debtor's account, but for whatever reason, it did not correct that omission at that time. On October 25, 2004, Countrywide conducted an escrow analysis and

changed the Debtor's stated monthly payment amount to $639.98 from $486.31, effective on December 1, 2004. However, despite the notice requirements in the *Confirmation Order* and this Court's Procedure #9, Countrywide failed to provide notices of this payment change to the Debtor, her attorney, or the Chapter 13 Trustee. Subsequently, Countrywide applied the increased payment amount to the Debtor's account eight times between December 2005 and February 2007. Contrary to its own procedures, as well as the requirements of the *Real Estate Settlement Practice Act*, see *12 U.S.C. §2609* and *24 C.F.R. §3500.17(c)(3),* Countrywide failed to do an annual escrow analysis on the Debtor's account in 2005 or 2006.

On February 1, 2007, the Chapter 13 Trustee filed an *Application for Approval of Final Report of Completion of Chapter 13 Plan* ("Application"), together with a proposed *Order*, Document No. 43. The *Application* reflected that all plan payments required under the *Amended Plan* had been paid and the mortgage payments were current through the December 6, 2006 mortgage payment. The Trustee's last distribution to Countrywide was made on November 22, 2006 in advance of the December 2006 regular monthly mortgage payment. During the course of the *Amended Plan*, the Debtor fully paid her mortgage arrearage of $7,210.89 as set out in National City's Proof of Claim. The Chapter 13 Trustee made arrearage-related disbursements of $4,007.19 to National City and $3,203.70 to Countrywide. In addition, $33,853 was disbursed for current monthly mortgage payments during the course of the *Amended Plan*. The *Application* requested, among other things, that the Court enter an order determining that the *Amended Plan* had been completed and was binding on all creditors.

On February 4, 2007, Countrywide was served by first class United States mail with copies of the *Application*, the *Final Report*, the proposed *Order,* and the *Order* setting hearing date at the address it listed on its notice of transfer. Countrywide did not file a response to the *Application* or the *Final Report*. On March 9, 2007 this Court entered an *Order* ("Cure Order")*,* Document No. 46, which approved the Trustee's Final Report and Account and provided in part:

> Each and every creditor is bound by the provisions of the completed plan, whether or not the claim of such creditor is provided for by the Plan, and whether or not such creditor has objected to, has accepted or had rejected the Plan. All mortgage and other secured debts provided for by the Plan are hereby found to be cured of any and all monetary defaults as of the date of the Trustee's last distribution, and no additional interest, late fees or penalties may be assessed for the time periods or payments due prior to that date.

On March 16, 2007, the Court entered a *Discharge of Debtor after Completion of Chapter 13 Plan* (the "Discharge Order") granting the Debtor a discharge pursuant to *11 U.S.C. §1328(a)*. Countrywide received actual notice of both the *Cure Order* and the *Discharge Order* on March 19, 2007. Countrywide did not seek reconsideration of or appeal of either the *Cure Order* or the *Discharge Order*. On March 29, 2007, those *Orders* became final and binding. On May 18, 2007, the *Final Decree* was entered and the case was closed.

After the Chapter 13 Trustee finished making mortgage payments under the *Amended Plan*, the Debtor contacted Countrywide service representatives to determine the correct payment amount she should be making. She was not provided with the requested information but was instead told she should "speak to her attorney." The Debtor called Mr. Steidl who told her she should pay the amount she had been paying prior to the bankruptcy. On February 11, 2007, the Debtor made her

January and February, 2007, monthly mortgage payments directly to Countrywide with two checks, #8410 and #8411, both in the amount of $490.00. The checks were accepted by Countrywide and cashed. On March 7, 2007, the Debtor sent her March 2007, monthly mortgage payment directly to Countrywide, check # 8441, in the amount $490.00. That check was also accepted and cashed by Countrywide.

At some time around March 20, 2007, Countrywide performed a discharge audit on the Debtor's loan. The stated purpose of the discharge audit is to perform a full review of the account while it has been in Countrywide's Bankruptcy Department so as to identify and ensure that all procedures have been followed and that the status of the loan is correct prior to releasing it from the Bankruptcy Department. One part of the audit is apparently designed to compare the Chapter 13 Trustee's disbursements with Countrywide's postings in order to identify and reconcile any discrepancies. In the Debtor's case, the discharge audit failed to reconcile the discrepancies between the Trustee's records and Countrywide's records as noted above and incorrectly concluded that the Debtor did not make payments for June 2005, August 2005, April 2006, November 2006, and January 2007. The audit also failed to correct Countrywide's loan records to reflect a "paid-through" date of March 2007, rather than the October 2006 paid through date, reflected on its loan history.

On March 26, 2007, Countrywide re-instituted the foreclosure process on the Debtor's home that had been interrupted several years earlier by her bankruptcy filing. The "AS-400"[4] for her loan contained an entry dated March 26, 2007, stating that team leaders and managers were advised

_____

[4] "AS-400" is the name given by Countrywide to its electronic loan servicing program. All loan servicing information and events are supposed to be entered into the AS-400 system without exception. All Bankruptcy Department employees have access to the AS-400 system.

that the Debtor's bankruptcy was terminated and the appropriate office was to continue with the foreclosure process. Shortly thereafter, the Debtor was contacted by Countrywide and told that she owed money. The Debtor again informed Countrywide personnel that her loan was not in default and that she had successfully completed her bankruptcy and was current in her payments. Despite receiving this information, Countrywide failed to stop the foreclosure process and correct its records. On March 29, 2007, an escrow analysis was performed on the Debtor's loan and the regular monthly mortgage payment amount of $639.98, as calculated by the 2004 escrow analysis, was reduced to $523.82, due to an "escrow overage."

On April 9, 2007, Countrywide sent a *Notice of Intention to Foreclose* to the Debtor which stated that she owed $4,166.16 for missed payments from November 2006 to April 2007. On April 12, 2007, the Debtor once again told Countrywide personnel by telephone that she owed nothing and had received a bankruptcy discharge. On or about April 13, 2007, the Debtor sent her April 2007 monthly mortgage payment, in the amount of $500, to Countrywide, which returned the payment on April 16, 2007, stating it was being returned, "due to less than 1 of 6 p[ayments]/no commitment to cure."

As a result of Countrywide's failure to cease the foreclosure process, the Debtor contacted Mr. Steidl and asked for his help. On April 23, 2007, Mr. Steidl sent a letter to Countrywide at the appropriate address in which he expressed the view that the mortgage should actually be in a current status because of the effect of the *Cure Order* and the uninterrupted payments the Debtor had been making since the completion of the *Amended Plan*. The letter also enclosed several relevant documents from the bankruptcy case, asked Countrywide to adjust its records to

show the mortgage was current, and asserted that, if necessary, he would file a motion to enforce discharge. Mr. Steidl never received a reply to this letter.

On May 10, 2007, the Debtor made her May 2007, monthly mortgage payment, in the amount of $523.82, and re-sent her April monthly payment in the amount of $523.81. Countrywide returned the May and April payments on May 16, 2007, stating that $1047.63 was returned, "due to 2 of 7 p[ayments]/no commitment to cure." The Debtor continued to send monthly payments to Countrywide every month, from June through October 2007.

On May 20, 2007, Landsafe Title issued a title report for Countrywide on the Debtor's property and stated, among other things, that bankruptcies "had not been searched" and that Countrywide would provide bankruptcy information. On May 25, 2007, Countrywide made a referral to GMM for purposes of filing a foreclosure action on the Debtor's mortgage[5]. A paralegal at GMM prepared a foreclosure complaint against the Debtor pursuant to the firm's policy. The paralegal used a foreclosure complaint checklist to prepare the complaint, mistakenly answering "No" to the question, "Does the Title Search show any bankruptcy filings." GMM itself did no research on PACER or elsewhere to determine whether the Debtor had filed for bankruptcy. Per GMM firm practice, no attorney was involved in the preparation or review of the foreclosure complaint against the Debtor before it was filed and it was not signed by an attorney, although a signature appearing to be that of attorney Joseph Goldbeck was placed on the signature line.[6]

---

[5]      GMM represents secured creditors in New Jersey and Pennsylvania and it has represented Countrywide since 1995. In 2007 it earned roughly $1.8 million in legal fees from Countrywide, approximately 10% of its total revenues.

[6]      See the further discussion of this point, *infra.* at p. 71-72.

On June 15, 2007, Countrywide, through GMM, filed the complaint in mortgage foreclosure against the Debtor in the Court of Common Pleas of Allegheny County, Pennsylvania. The foreclosure complaint incorrectly alleged that the mortgage was in default because monthly payments of principal and interest were due and unpaid for November 1, 2006, forward. The complaint demanded payment for unpaid principal, interest, late charges and other fees totaling $37,880.69.

The Debtor took a couple of actions in response to the filing of the foreclosure complaint by Countrywide. One was to file a complaint with the Pennsylvania Attorney General. Her complaint set forth the pertinent facts and questioned how Countrywide could file a foreclosure action when they had been paid. She stated that her attorney had done his best to resolve the matter but "Countrywide just ignores everything." Upon receipt of that complaint, the Attorney General sent a letter to Countrywide advising it that a complaint had been filed and enclosing a copy. Countrywide was requested to respond in writing within 15 days. Countrywide misidentified the Debtor's complaint to the Attorney General and routed it to a technician. It did not conduct an investigation or take any other action to respond to the Attorney General.

The Debtor, acting through Mr. Steidl, also moved to reopen the bankruptcy case and filed the *Motion to Enforce* on June 25, 2007. The *Motion to Enforce* recited the key facts concerning the completion of the *Amended Plan,* the entry of the *Cure Order*, and the Debtor's own payments made after completion of the *Amended Plan* in support of the contention that the mortgage was current. The *Motion to Enforce* asked the Court to enter an order requiring Countrywide to cease its collection efforts and to amend its records to reflect that the loan was current.

On August 1, 2007, Countrywide, through GMM, filed a *Response* to the *Motion to Enforce* at Document No. 73. The *Response* was prepared by Ann Swartz, an attorney at GMM who was not admitted to practice in the Western District of Pennsylvania. Swartz placed the "e-signature" of Puida (who is admitted to practice in this Court) on the signature line of the *Response*. Although it purported to be signed by her, Puida did not assist in the preparation of the *Response* nor did she review it prior to its filing. The *Response* admitted a number of the allegations in the *Motion to Enforce*, but stated that Countrywide lacked sufficient information as to other allegations which were thus deemed denied. A number of "affirmative defenses" were also set forth.

A first hearing on the *Motion to Enforce* was held on August 8, 2007 before the Honorable Jeffery A. Deller after he reopened the case and permitted the *Motion to Enforce* to proceed. Countrywide was represented at this hearing by local Pittsburgh counsel, whose services had been retained by GMM. Judge Deller was advised by local counsel that Countrywide needed some additional time to conduct an investigation into the allegations contained in the *Motion to Enforce*. Judge Deller continued the matter to September 19, 2007, along with giving some cautionary instructions to counsel:

> I read your client's answer and compared it to what the motion recites, which is a simple motion. They talk about the payments [that] were tendered and when we get here your client doesn't have any information. You should know whether payments have been tendered or not. You should know whether payments have been returned or not. These type of institutions keep records to that effect. And to file an answer which says well, we really don't know anything, candidly, is ridiculous....
>
> I'll continue this for a period of 30 days. ... you might want to read *In Re Szalinski*, one of my opinions that are online and *in Re Miller*.

*See Transcript of Hearing* on *Motion to Enforce*, Aug. 8, 2007, at 4-5, Document No. 123.[7]

---

[7]     For the cases to which Judge Deller made reference, *see* In re Miller, 2007 WL 81052 (Bankr. W.D. Pa. 2007) and *In re Szalinski*, 360 B.R. 104 (Bankr. W.D. Pa. 2007).

At the continued hearing, Countrywide's local counsel again appeared, while Mrs. Steidl appeared for the Debtor. Prior to the hearing, Puida instructed local counsel to raise the issue of post-petition tax payments by Countrywide. Countrywide's theory of recovery based on post-petition payment of taxes is that it was owed for the difference between what it advanced in escrow payments during the postpetition period beginning in July 2003 and what was collected from the Debtor to pay these escrow advances during this same period. Judge Deller questioned the viability of that theory in light of the language in the *Cure Order*, again pointing out that his decisions in *Szalinski* and *Miller* did not allow mortgagees to come in after the fact and seek to collect escrow shortfalls when they failed to follow the proper procedures for doing so during the case. Judge Deller encouraged local counsel to make his client aware of those cases and allowed a further continuance of the matter to October 31, 2007, which he stressed would be the "final hearing" on the matter. *See* Tr. of 9/19/07 hearing at 3-4, Document No. 124.

A number of relevant communications transpired between Countrywide and GMM at around this time concerning the Debtor's loan account. On September 18, 2007, a day before the hearing referred to above, a Countrywide bankruptcy specialist, Kimberly Hill, sent an e-mail to GMM paralegal Christopher Amann. The e-mail included payment change information and with regard to the Debtor's loan, stated:

> The debtor is due 11/1/06-present. Payment amount from 1/2006-4/1/2007 is 639.98. Effective 5/1/07-present the payment is 523.82 per escrow analysis that was done. Thank you.

*See UST Exhibit CA*; 12/10 tr. at 282.[8]  On September 20, 2007, a day after the hearing,  Amann sent

an e-mail to Kimberly Hill stating in part:

> Hi Kim, the hearing on debtor's Motion to Enforce Discharge has been
> continued to 10/31/07. We will need the following information in order to
> be fully prepared for this hearing.
> •    Payment amount when your office acquired the loan and each payment
> change thereafter.
> •    A payment history from 2003 that shows which monthly contractual
> and/or postpetition payments were credited with each payment.  Please be
> advised that this information must be received by **October 4, 2007.**
> Thank you in advance.
> Chris

*See GMM Exhibit G.*

In response to that e-mail, Kimberly Hill accessed the "Impound/Escrow Account

Review" screens for the Debtor's loan on Countrywide's AS-400 computer loan servicing system.

She then used a letter template to create three documents that reflected the date of each analysis of

the Debtor's escrow account, as shown on Countrywide's computer system and the change thereby

calculated to the Debtor's monthly mortgage payment, including escrow ("Payment Change

Letters").  On their face, the Payment Change Letters appeared to be copies of Letters actually sent

from Countrywide, under Kimberly Hill's signature,  to the Debtor on the dates of September 22,

2003, October 25, 2004, and March 29, 2007 notifying her of payment changes.[9]  *See GMM Ex. G.*

---

[8]    Trial was held on December 7-10, 2009.  References to testimony at trial are given by date and
transcript page.

[9]    Countrywide admitted that its policies required an escrow analysis to be performed by it each year
for loans in bankruptcy.  However, despite this policy, none was done for this Debtor's loan in either 2005 or 2006.
12/8 Trial Transcript at 232.  Countrywide could provide no explanation for its deviation from its policy with respect
to the Hill loan.  12/9 Trial Tr. at 32.

The Payment Change Letters also showed Mr. Steidl and the Chapter 13 Trustee as recipients of copies ostensibly sent on the dates reflected on them. There was no disclaimer or other indication on any of them to show that they were not, in fact, actual copies of authentic letters that were created and sent on the dates shown. In other words, as all Parties concede, in the absence of knowledge to the contrary, it would be reasonable for anyone to believe the Payment Change Letters were copies of actual Letters sent in the mail on the dates shown to the indicated parties.

Kimberly Hill transmitted the three Payment Change Letters along with some other materials to Amann at GMM via e-mail dated September 20, 2007 that stated:

> Chris,
> Attached are the payment change letters and the payment ledger for payments received under the bankruptcy. These are the only escrow analysis that have been done on this loan. I've requested the regular loan history to be faxed to you also. Please email me if any additional information is needed. Thank you.

*See GMM Ex. G.* Kimberly Hill did not include in this e-mail any explanation or disclosure that the Payment Change Letters were actually created on September 20, 2007, or that they had never been sent to the Debtor, her counsel, or the Chapter 13 Trustee. Despite the implication in Amann's e-mail to Kimberly Hill that the materials had to be received by October 4, 2007, for the October 31, 2007 hearing, there is nothing in the record to indicate that any of the materials sent by Kimberly Hill were then forwarded by GMM to Mr. Steidl at this time. Instead, the case appears to have been essentially dormant for the next several weeks.

Coincidentally, on October 10, 2010, the Chapter 13 Trustee for this district, Ronda Winnecour, filed *Motions to Compel* against Countrywide in 293 separate Chapter 13 cases,

including this Sharon Hill case. Countrywide was served with these motions on October 15, 2010. On October 18, 2010 the UST then filed *Notices of Rule 2004 Exams* in 10 of those 293 cases, including the Hill case, and served them on GMM. Michael McKeever promptly forwarded the *Notices* to his contact at Countrywide, John Smith, the Vice President of Foreclosure, Bankruptcy Real Estate Management.

The combination of these actions by the Chapter 13 Trustee and the UST dramatically elevated the visibility and importance of the Hill case to Countrywide. While it appears to have been previously treated as a relatively low-level matter by Countrywide, it suddenly became a matter of concern to high-ranking individuals at the company such as Smith, his boss Mark Acosta, and Assistant General Counsel Charles Townsend. Outside litigation counsel also became involved by no later than October 24, 2010. At GMM, whereas the matter had formerly been solely the responsibility of Puida, named partners McKeever and McCafferty now became directly involved in the case.

The new-found significance of the Hill case for Countrywide and its attorneys originally seems to have been largely related to the fact that, in regard to the unresolved *Motion to Enforce,* it was an open, pending case, something of potential relevance on the issue of whether the UST had standing and authority to pursue *Rule 2004* exams against Countrywide.[10]

---

[10]     The matter involving the UST's attempt to conduct *Rule 2004* exams was heard at Misc. No. 07-204. The Court conducted a status conference in that matter on November 15, 2007, and the fact that the Hill case was the one ongoing case among the ten in which exams were being sought was prominently featured. In response to a question from the Court as to the limitation on the UST's asserted power to engage in *Rule 2004* exams pursuant to *11 U.S.C. §307*, counsel for Countrywide stated that the UST could only act in an "active case or proceeding that is not disposed of by res judicata." *Tr. of 11/15/2007 hearing at 30, Doc No. 29 in Misc. No. 07-204.* After some further discussion about the ten cases in which the UST sought to take *Rule 2004* exams during which the Court expressed some doubt as to whether the UST Could act in old, closed cases, the following exchange occurred between the Court and Countrywide's attorney:

Events occurring between October 24-26, 2007, are key to the Court's decision and must be examined in some detail.  As a first step in the case following its new prominence,  Puida was apparently asked to prepare a status report on the case because she e-mailed such a report to McKeever and McCafferty on October 24[11] at 1:07 P.M.[11]   This report summarized the status of the case and made reference to the  Payment Change Letters, including them as attachments to the e-mail.  Puida's report notes the failure to implement the payment changes as set forth in the Payment Change Letters  as the reason for the Debtor purportedly owing an arrearage.  McKeever forwarded this report and the attachments to several people at Countrywide, one of whom in turn forwarded it to Melissa "Lisa" Middleton,  the head of the Countrywide Bankruptcy Department.  Middleton in turn forwarded the report and attachments to Bobbi Hook, Assistant Vice President of Bankruptcy and asked her to review them.

In reviewing the attachments, Hook realized that something was amiss because two of the Payment Change  Letters predated Kimberly Hill's employment at Countrywide, so it would have been  impossible  for  her  to  have  sent  them.   Hook  also  checked  the  Countrywide  AS400

(n. 10, cont. from pg. 17)

| Court: | Let's take the current case that Judge Deller's investigating [i.e., Hill].  No res judicata, still in play.  Why can't the U.S. Trustee come  in and take a 2004 exam based on what's going on there? |

| Counsel: | Because the debtor and Countrywide are about to present an agreed order to Judge Deller on December 12th. |

*Id.* at 38.  Counsel obviously proved to be mistaken in this assertion that an agreed order was about to be presented but the point is clear that Countrywide thought that by settling Hill it could thwart the UST's efforts regarding the *Rule 2004* exams.

[11]     There is some confusion in the case involving the timing of e-mail communications between GMM and Countrywide because they are in different time zones–GMM in the Eastern and Countrywide in the Central. The same e-mail may thus show two different "sent" times depending on where it was received.  For purposes of this Opinion the Court has attempted to "convert" all times to Eastern time.

computer system and imaging system only to discover that no such Letters had ever been sent. Hook reported the news of her discovery to Middleton on October 25th and was instructed by Middleton to speak to Kimberly Hill about the matter and also to advise Countrywide's outside counsel of her findings in regard to the Payment Change Letters.

At about the same time as this was happening, on October 25th at 3:09 P.M., in an effort to begin negotiations toward a resolution of the *Motion to Enforce* which appears to have been spurred on by the heightened status of the case, and following a telephone discussion, Puida sent a facsimile to Mr. Steidl that included the three Payment Change Letters, a payment history for the Debtor's loan from 2003 to date, and the Chapter 13 Trustee's ledger relating to the Debtor's loan. This facsimile stated:

> Attached please find payment change letters, a payment history from 2003 to the present and the trustee's ledger.
>
> My review of this information leads me to think that the discrepancy in this case stems from the failure of the trustee to disburse the increased monthly payment amount throughout the case.
>
> Please review and advise if you agree. If so, please advise if the debtor would be interested in amicably resolving the matter.

*See UST Exhibit BZ.*

The high level of interest in trying to settle the Hill case is further indicated by the fact that Puida advised McKeever that same date by e-mail at 7:49 P.M. of her efforts to contact Mr. Steidl and concluding that she would try sending a fax to him at home. At 8:00 P.M. Puida did send Mr. Steidl a fax at his home stating that she wanted to resolve the matter and it would need to be done the next day (October 26th) because her "client" would be out of town the next week.

Efforts at settlement of the *Motion to Enforce* continued the next day, October 26th. At 10:54 A.M. Puida sent an e-mail to Townsend, McKeever, McCafferty and Smith summarizing her activities the previous day and stating that she had already tried to reach Mr. Steidl three times that day. Puida's e-mail says that Mr. Steidl had not yet looked into the matter and not reviewed the documentation that was sent to him on September 24, 2007 so she "resent" the information to him. Despite that assertion, no documentary evidence exists supporting the notion that the materials had ever been sent to Mr. Steidl on September 24th and nothing in the October 25th fax from Puida to Mr. Steidl indicates that this was a "resend" of materials previously provided.

Apparently sometime within an hour or so of sending that e-mail to Townsend and others, Puida did then speak with Mr. Steidl because at 1:03 P.M. she sent an e-mail to McKeever reporting on her conversation with him, including Mr. Steidl's statement that he did not have any copies of the Payment Change Letters in his file. At 2:05 P.M. Puida sent an e-mail to Townsend, McKeever, McCafferty and Smith that was largely the same as the one she had previously sent to McKeever at 1:03 P.M., with the notable omission of Mr. Steidl's statement about not having copies of the Payment Change Letters in his file. Puida also asked for settlement parameters that would be acceptable to Countrywide, stating that she would do her best to have the matter resolved prior to the October 31st hearing.

Shortly after Puida's 2:05 P.M. e-mail was sent, Hook and Puida had a discussion during which Hook provided Puida with settlement parameters. Puida reported this conversation to Smith, McCafferty and McKeever in an e-mail sent at 3:00 P.M. and said she would do all she could to have the matter settled by "Tuesday," *i.e.*, by October 30th. Hook reported on this same conversation to Smith and Middleton in an e-mail sent at 4:24 P.M.

Hook testified at trial that it was during this conversation on October 26th with Puida that she advised Puida about the true nature of the Payment Change Letters. (12/9 Tr. at 75). Puida acknowledged that she was told about the Payment Change Letters by Hook, but she thought it had occurred during a conversation on a later date, sometime after October 30th, though she could not point to an exact date or time. (12/9 Tr. at 398). The Court found Hook to be credible on this point and accepts her testimony that the conversation about the Payment Change Letters occurred on October 26th.[12] Also on October 26th, Mr. Steidl forwarded the Payment Change Letters and other materials to the Debtor, along with a cover letter that noted he had reviewed his files and could not find the Letters and wondered whether she had them.

Despite all these efforts, the Hill case did not get settled on October 26th, which was a Friday. On October 29th Hook spoke with Kimberly Hill about the Letters and reported to Middleton about that meeting and her conversation with Puida. On October 30th GMM faxed a proposed consent order to Mr. Steidl showing an arrearage of $4,306. The next scheduled hearing on the *Motion to Enforce* went forward on October 31st, and based upon representations by counsel for both Parties that settlement discussions were ongoing, it was again continued by Judge Deller to December 12, 2007, even though he had previously cautioned there would be "no further continuances."

On November 5, 2010, the *Rule 2004 Notices* filed by the UST were consolidated under a new Miscellaneous No. 07-204 and assigned to this member of the Court. Countrywide filed

---

[12] The issue of whether Puida in turn ever informed Mr. Steidl about the Letters was sharply in dispute and is one of the specified points in the *Rule*. Given that, the Court addresses that point in more detail in the *Legal Discussion* portion of this Opinion.

a *Motion to Quash* in that matter on November 9, 2007 which included the statement that it believed the Debtor had received proper notice of increases in post-petition mortgage payments in this case. Document No. 13 at 11. A hearing on the *Motion to Quash* was held on November 15, 2007 and a few days later the Court issued a briefing schedule and set final argument for January 7, 2008. The Hill case, and the fact that it was an open, pending matter featured prominently in the November 15, 2007 argument. *See, generally,* Document No. 29 in No. 07-204 (Transcript of November 15th hearing).

On November 19, 2007, the pending *Motion to Enforce* in Hill was transferred from Judge Deller to the undersigned and a status conference was set for December 20th with the December 12th hearing cancelled. The Parties continued settlement efforts during this period. On December 6, 2007 Puida faxed another proposed consent order to Mr. Steidl, this one lowering the arrearage amount to $3,309. She explained that the amount had been reduced because Countrywide became aware that it had previously failed to account for the $973 payment that had been made to the prior servicer. On December 17th Puida again sent a letter to Mr. Steidl with a proposed consent order showing a $3,309 arrearage.

This set the stage for the events of December 20th. Ms. Steidl was to appear for the Debtor at the hearing. While she was reviewing the Hill file in preparation around 8:20-8:25 A.M. that morning she happened to notice the curious issue related to the office address set forth above and asked her husband when their firm had moved to its present location because she was not sure of the date. He told her that the firm had not moved until October 2003 and had not received mail at the current address before then. Ms. Steidl informed him that one of the Letters predated that

move but showed the current address and the two agreed that she would attempt to get an explanation from Countrywide at the hearing later that day.

That same day a meeting involving Puida, McKeever, Townsend, Smith, and outside Countrywide attorneys Thomas Connop and Dorothy Davis, was held at the office of Davis in Pittsburgh to prepare for the same hearing. Puida and McKeever traveled from Philadelphia to attend the meeting and Townsend, Smith and Connop came from Dallas. During that meeting Puida informed the participants about the Payment Change Letters, which came as "news" to everyone but Smith and McKeever.[13]

Ms. Steidl happened to see Puida in the hall outside the courtroom prior to the hearing and asked her about the Letters. Puida said the Letters had never been sent. A short time later, during the hearing itself, Ms. Steidl raised the question about the Payment Change Letters, making the Court aware of them for the first time. The Court questioned Puida about the Letters, a subject discussed in further detail below. The end result of the hearing on December 20th was that the Court entered a pretrial scheduling order and directed that copies of the Letters be filed with the Court.

On March 3, 2008, the Debtor filed an *Amended Motion to Enforce Discharge* ("Amended Motion to Enforce") against Countrywide. By this time, Countrywide, through GMM, had dismissed the state foreclosure action against the Debtor, occurring on or about February 8, 2008.

---

[13] McKeever had been told about the Letters by Puida sometime after her conversation with Hook, and Smith found out about the Letters a week or so prior to the December 20th meeting in a conversation with Middleton.

In the *Amended Motion to Enforce* the Debtor sought damages for injury to her credit and the loss of the opportunity to obtain future credit, for physical damage to her health and emotional distress, for punitive damages and sanctions, and for attorneys' fees, and requested that she be allowed to file an adversary proceeding for statutory damages under the *Fair Debt Collections Practices Act*, *15 U.S.C. §§1601-1616* and the Pennsylvania *Unfair Trade and Business Practices Act*, *73 P.S. §§201-1 - 201-9.3.*

Thereafter, Countrywide and the Debtor reached a written Settlement Agreement which resolved all claims, specifically including, but not limited to, the *Motion to Enforce* and the *Amended Motion to Enforce*. The Settlement Agreement provided*, inter alia*, Countrywide making payment of $100,000 to the Debtor, in the form of satisfaction of the note and release of the mortgage securing the note, with the balance to be delivered in cash, payable to the Debtor and the Debtor's attorneys for distribution to them in accordance with instructions from this Court, correction of the Debtor's credit records, sealing of the Foreclosure Action, the Debtor's dismissal of the *Motion to Enforce* and the *Amended Motion to Enforce*, the Debtor's return of documents produced to her by Countrywide, and mutual releases, all as more specifically provided therein.

Countrywide and the Debtor filed a *Joint Motion to Approve Settlement and Compromise* on May 2, 2008, which the Court denied without prejudice on May 6, 2008, pending receipt of additional information. The Debtor and Countrywide filed an *Amended Joint Motion to Approve Settlement and Compromise* on June 19, 2008, to comply with the Court's directive. On August 8, 2008, the UST filed a response to the *Joint Motion to Approve Settlement and Compromise* which did not object to the proposed settlement, but did ask that any order approving

the settlement be without prejudice to her pursuit of a *Motion for Rule to Show Cause*. After hearing on the *Joint Motion to Approve Settlement and Compromise* on August 11, 2008, the Court entered an order approving the settlement.

On June 23, 2008, the UST filed her original *Motion for Rule to Show Cause*. On June 30, 2009, the UST's *Amended Motion for Rule to Show Cause* was filed.[14] Thereafter, the UST and the Respondents engaged in extensive discovery which ultimately resulted in the Court entering the *Rule* currently at issue. In December 2009, a four-day trial on the matter was held. On January 12, 2010, closing arguments were heard. The Parties have since filed Proposed Findings of Fact and Post-Trial Briefs.[15]

---

[14] The *Amended Motion for Rule to Show Cause* became much more focused than its predecessor. Rather than alleging systemic and company-wide problems with the manner in which Countrywide, as a whole, serviced its vast mortgage portfolio as was done in her original motion, the UST in her *Amended Motion* merely sought a remedy for Countrywide's mishandling of the Sharon Hill bankruptcy, specifically.

[15] With these materials in hand, the Court was finalizing its work on this *Opinion* when, on May 20, 2010, the UST filed a brief and rather cryptic *Status Report* indicating that she had reached a "conditional resolution" of the matters in dispute with Countrywide, asking the Court to defer its decision on the *Rule* as against Countrywide, only, pending the satisfaction of certain, undisclosed conditions precedent to that resolution. On July 11, 2010, the Court convened a Status Conference in an effort to acquire additional information concerning this conditional resolution. At that time, the UST and Countrywide advised the Court that they were requesting a "stay" of the Court's decision because a nationwide "global settlement" had been reached in a pending Federal Trade Commission matter involving Countrywide in the Central District of California. The Parties were vague as to the terms of the resolution but the implication was that a conclusion of that settlement would satisfy the UST and obviate the need for further proceedings under the *Rule* as against Countrywide. The Parties also represented that a part of the settlement would result in Countrywide filing a motion, supported by the UST, seeking a dismissal of this matter as to Countrywide. Based on these representations, the Court advised the Parties that it did not believe any settlement between Countrywide and the UST would be binding on it and require a dismissal because the *Rule* was issued by the Court, not the UST. The Court stated it would not stay this proceeding, *per se*, but would consider any motion to dismiss once it was filed. Thereafter, the Court continued working on the within *Opinion* but with a "watchful eye" for the filing of a motion to dismiss which it anticipated would be done fairly soon. However, nothing along those lines occurred until August 16, 2010, when Countrywide filed its *Motion to Dismiss with Prejudice to the Court's July 29, 2009 Amended Rule to Show Cause* as to it, Document No. 541 ("Motion to Dismiss"). (The *Motion to Dismiss* is something of a misnomer because the Court issued only one *Rule*, there was no "Amended Rule." The predicate for the *Rule* was the *Amended Motion for Rule to Show Cause* filed by the UST, so perhaps that is from where Countrywide's confusion stems). On August 26, 2010, the UST filed a *Statement* indicating her support for the *Motion to Dismiss*. *See Document No. 547.* (Cont. on pg. 26)

## DISCUSSION

### (A) The Court's Rule to Show Cause

The *Rule* is directed against Countrywide, GMM, and Puida and was very deliberately limited to seven well-defined Items of potentially sanctionable conduct related to this whole matter, four directed to Countrywide and three to GMM and Puida. The Court's approach to resolving the specified matters before it is to set forth each of the Items as stated in the *Rule*, followed by a discussion of whether the evidence supports the imposition of any kind of sanction against the respective party involved. The seven Items of inquiry identified by the Court in the *Rule* involve the following, allegedly inappropriate instances of conduct:

> (1)     Countrywide failing to properly account for chapter 13 payments made by the Debtor during the pendency of her case.
>
> (2)     Countrywide knowingly and willfully violating the discharge injunction granted to the Debtor through numerous and sustained attempts to collect on questionable debt which, by appropriate review of applicable records, was current as of the time of entry of the discharge order.
>
> (3)     Countrywide intentionally, or with reckless disregard and/or indifference to the applicable facts, misleading the debtor's attorneys into believing change notices had been timely sent via the use of three "created" Payment Change Letters, when in fact they had not, and during such time attempting to resolve a dispute pending before this Court.

---

(Cont. from p. 25)        Now that it has finally had an opportunity to fully review the settlement reached between Countrywide and the UST, the Court continues to be of the view that it is not bound by its terms and that to dismiss this matter on the basis of that settlement, even with the UST's support, is not relevant to matters pending before the Court in this instance. The Court provided the Parties with an opportunity to argue the *Motion to Dismiss* on October 4, 2010, which opportunity the Parties decided to waive. By separate *Order* entered this date, the Court denied the *Motion to Dismiss*.

> (4)     Countrywide intentionally, or with reckless disregard and/or indifference to the applicable facts, making misrepresentations to this Court in a pleading regarding the cause of its claimed escrow arrearages account regarding the Debtor.
>
> (5)     Goldbeck McCafferty and McKeever and Leslie Puida knowingly and willfully, or with reckless disregard and/or indifference to the applicable facts, violating the discharge injunction granted to the debtor by making numerous and sustained attempts to collect on debt they knew to be discharged or should have known was discharged.
>
> (6)     Goldbeck McCafferty and McKeever and Leslie Puida intentionally, or with reckless disregard and/or indifference to the applicable facts, failed to disclose to the debtor's attorney that three Payment Change Letters had never actually been sent, all in an improper attempt to collect on questionable debt while attempting to resolve a matter that was pending before this Court.
>
> (7)     Goldbeck McCafferty and McKeever and Leslie Puida intentionally, or with reckless disregard and/or indifference to the applicable facts, made inaccurate oral statements in response to the Court's inquiry regarding when Leslie Puida told the Debtor's attorney that the three Payment Change Letters were not what they purported to be, but instead were memoranda created years after the event.

Matters involving questionable conduct requiring further review by the Court also arose during the course of the trial on the *Rule*. Those matters will be separately addressed at the end of this *Opinion*.

Before turning to an individualized review of the foregoing Items, it is necessary to set forth the Court's view regarding the basis for its authority to act in this matter, as well as the standard which it will apply in evaluating the conduct of the Respondents. The Court issued the *Rule* and conducted the trial in this matter principally pursuant to its inherent power as a federal

court so as to achieve the orderly and expeditious disposition of cases by controlling the conduct of those who appear before it. As held in *Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991), such a power must be implied because it is necessary to the exercise of all other judicial powers by a court. 501 U.S. at 43.

In *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215 (3d Cir. 1995) the Court of Appeals of the Third Circuit discussed this inherent power as recognized in *Chambers* and found it to be properly exercisable by bankruptcy courts. The *Fellheimer* court noted that among the sanctionable conduct a court's power in this regard reaches are those cases in which a party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." 57 F.3d at 1224 (quoting *Chambers*, 500 U.S. at 45-46). Four other circuit courts which have also recognized that bankruptcy courts possess such inherent power, *see In re Downs*, 103 F.3d 472 (6th Cir. 1996), *In re Jove Eng'g , Inc.*, 92 F.3d 1539 (11th Cir. 1996), *In re Rainbow Magazine, Inc.*, 77 F.3d 278 (9th Cir. 1996), and *In re Mroz*, 65 F.3d 1567 (11th Cir. 1995).

The *Fellheimer* court referenced *Chambers* to the effect that the imposition of sanctions pursuant to this inherent power serves the  purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court. 57 F.3d at 1224. It is thus apparent that the inherent power to sanction is distinct from the contempt power.[16] It is further

---

[16]  Respondents argue that the only basis for the Court to impose sanctions is through the contempt power. They further argue that civil contempt is not appropriate here because the Debtor has already been fully compensated as a result of the Settlement Agreement between her and Countrywide. Thus, they argue, any sanction imposed here by the Court would be purely punitive in nature, and necessarily a criminal contempt matter – something they say is beyond the power of a bankruptcy court. Respondents couch this as a lack of "jurisdiction" for the Court to act. The Court disagrees with that argument because it confuses the meaning of jurisdiction and it ignores the inherent power to sanction as discussed above. The Court  is nonetheless acutely aware of the command to exercise "restraint and discretion" in exercising its inherent  power, *Fellheimer*, 57 F.3d at 1224,  and intends to do so here. Of course, to the extent the Court finds that Respondents' conduct does not rise to the sanctionable level under the inherent power, the argument presented by Respondents is essentially moot anyway.

apparent that the level of misconduct that must be found to justify the imposition of a sanction pursuant to the inherent power exceeds that which is merely inadvertent or even negligent. In *Martin v. Brown*, 65 F.3d 1252 (3d Cir. 1995) the court noted that there was some discrepancy in Third Circuit precedent as to whether a specific finding of "bad faith" is required to impose a sanction under the inherent authority. *Id.* at 1265 (contrasting *Landon v. Hunt*, 938 F.2d 450 (3d Cir. 1991) ( finding of bad faith required), with *Republic of Phillipines v. Westinghouse Electric Corp.*, 43 F.3d 65 (3d Cir. 1994) (bad faith not always required)). Without explicitly attempting to reconcile these two views, the *Martin* court stated that generally, the inherent power "should be reserved for those cases in which the conduct of a party or an attorney is egregious and no other basis for sanctions exists." *Id.* The American Heritage Dictionary defines "egregious" as "conspicuously bad or offensive." That is the touchstone the Court will apply in deciding whether to impose sanctions in this matter.

       In addition to the inherent power, another basis for imposing sanctions for at least part of the alleged conduct involved in this matter may be found in *Fed.R.Bankr.P. 7037*, incorporating *Fed.R.Civ.P. 37(c)(1)(C)*, which authorizes the Court to impose "appropriate sanctions" for certain discovery-related offenses, including a failure to correct a discovery disclosure that is later learned to be false. Thus, insofar as the *Rule* includes conduct related to the production of the Payment Change Letters as part of the discovery done in connection with the *Motion to Enforce*, *Rule 7037* provides another source of authority for the Court to act if the circumstances of this case so warrant.

Finally, since Item 4 of the *Rule* as directed against Countrywide concerns an alleged factual misrepresentation contained in a pleading filed with the Court, the sanctioning authority provided by *Fed.R.Bankr.P. 9011(c)* is implicated with respect to that part of the *Rule*.

The Court now turns to its individualized review of the Items in the *Rule*.

### (1)     *Countrywide failing to properly account for chapter 13 payments made by the Debtor during the pendency of her case.*

There is no doubt that Countrywide failed to properly account for the Debtor's payments to it and its predecessors. At trial, Countrywide acknowledged in its opening statement that mistakes were made in the handling of the Debtor's account. There was a dispute between Countrywide and the UST as to the exact number and pervasiveness of these "mistakes" but even by Countrywide's reckoning, they were substantial.

At the outset, Countrywide admits it failed to properly account for the June 25, 2003 payment of $971.74 made by the Chapter 13 Trustee to the prior loan servicer when it took over responsibility for the loan. Countrywide acknowledged that this failure had a "cascading effect" that was largely responsible for the post-discharge miseries experienced by the Debtor.

Countrywide also admits that during the course of the Chapter 13 case it failed to comply with the requirement in the *Confirmation Order* and Chapter 13 Procedure *#9* of this Court that required a notice of payment change be sent to the Debtor, her attorney, and the Chapter 13 Trustee before any payment change could take effect. This failure means the Debtor was not

properly apprised of changes to her monthly mortgage payment being made by Countrywide due to escrow needs during the course of her bankruptcy. Countrywide also concedes that the discharge audit of the Debtor's loan done in March 2007 was improperly conducted. A loan coming out of a Chapter 13 discharge and showing a delinquency should have been referred to higher level management at Countrywide, not to foreclosure.

By the UST's reckoning there were even more mistakes made by Countrywide with respect to the Debtor's account. But that is really gilding the lily at this point since by Countrywide's own admission it can properly be found at fault for failing to properly maintain the Debtor's loan account during the bankruptcy. Even so, the Court does not find that these mistakes rise to the level of sanctionable conduct.

While the actions of Countrywide personnel with respect to payments on the Debtor's account were sloppy and derelict, the Court finds no evidence of the sort of bad faith or intentional misconduct that would support the entry of a sanction under the Court's inherent power. The UST failed to show that these types of errors both were routinely made by Countrywide in bankruptcy cases pending throughout the country and were detrimental to the entire bankruptcy system. The Court also finds no evidence was presented to show that the type of mistake involved in the handling of the Debtor's account was a routine feature of the Countrywide accounting process for loans in bankruptcy. *See, e.g., In re Nosek*, 2010 WL 2350579 (1st Cir. June 14, 2010) (misrepresentation that was not a deliberate falsehood and not intended to mislead the court would warrant at most a modest sanction). Finally, the conclusion that Countrywide should not be sanctioned under this element of the *Rule* is further bolstered by the fact that the party most directly affected by these

inexcusable instances of neglect – the Debtor – has been fully compensated pursuant to the Settlement Agreement.

> **(2)**     ***Countrywide knowingly and willfully violating the discharge injunction granted to the Debtor through numerous and sustained attempts to collect on questionable debt which, by appropriate review of applicable records, was current as of the time of entry of the discharge order.***

Going in to the trial, the Court did not anticipate that there would be a significant dispute as to whether Countrywide's post-discharge pursuit of an arrearage claim against the Debtor was legally permissible. The Trustee reported the *Amended Plan* as completed and all agree that as soon as the Trustee made the final payment to Countrywide under the *Amended Plan*, the Debtor immediately stepped in and began making the normal monthly payments (or at least attempted to do so). The March 9, 2007 *Cure Order,* a standard form order used in this District, clearly provides in part that

> "[a]ll mortgage and other secured debts provided for by the Plan are hereby found to be cured of any and all monetary defaults as of the date of the Trustee's last distribution, and no additional interest late fees or penalties may be assessed for time periods or payments due prior to that date."

*See* Document No. 46 at ¶3. The *Discharge Order*, Document No. 49, was entered one week later. Additionally, the *Confirmation Order* and this Court's Chapter 13 Procedure # 9 require that all notices of post-petition monthly changes must be served on the debtor, debtor's counsel and the Chapter 13 Trustee so that an amended plan can be filed if necessary. Once Countrywide admitted that the Payment Change Letters were not real and no such payment change notices had ever been delivered in this case, that conclusively resulted in a finding that any attempt to collect the alleged arrearage debt from the Debtor was improper.

At trial, however, both Puida and McKeever (who were of course acting as attorneys for Countrywide during most of the time that the collection efforts were ongoing) testified that they believed that even though the Payment Change Letters had not been sent there remained a legal basis to attempt to collect the debt pursuant to *11 U.S.C. §1322(b)(5)*. *See,* 12/9 Tr. at 360-64 and 12/10 Tr. at 39, 72-73 (Puida); 12/8 Tr. at 127-28, 145, 152, 199 (McKeever). The legal theory as they expressed it at trial was that the unpaid escrow amounts that formed the arrearage Countrywide was seeking to collect had become part of Countrywide's lien on the Debtor's property and "passed through" the bankruptcy, unaffected by the discharge. Puida and McKeever both also expressed that they held this view contemporaneously with the collection efforts in 2007. In other words, they testified that this theory was not something that was thought up after the fact to try to justify the attempted collection.

The Court has some lingering doubts as to whether this legal theory was in fact within the contemplation of counsel back in 2007. There was no mention whatsoever of *Section 1322(b)(5)* in the Response to the *Motion to Enforce* filed by Puida on August 1, 2007, on behalf of Countrywide at Document No. 73. As best the Court can tell, the first reference to *Section 1322(b)* as a possible defense for Countrywide appears as the 'Eighth Defense' in Countrywide's Response to the *Amended Motion to Enforce* filed on March 13, 2008 at Document No. 168. Interestingly, that Response was filed by new counsel for Countrywide, not GMM. Additionally, that Response was filed after the questions about the Payment Change Letters had come to light. At this point it was apparent that Countrywide could not rely on the Payment Change Letters to support its collection attempts against the Debtor and it therefore needed some other basis for doing so.

Having said that, the Court will nevertheless accept the testimony of Puida and McKeever to the extent that, at the relevant time, they believed Countrywide had the benefit of a potentially viable legal theory to support their collection efforts even in the absence of actual, payment change notices having been sent. At the very least, nothing presented at trial indicated that Countrywide's continued collection efforts against the Debtor were made over the objections or warnings of GMM. One might cynically draw the conclusion that GMM was not about to say "no" to one of its largest clients, but the Court will adopt the view that GMM was motivated by its professional responsibility and saw nothing wrong with what Countrywide was asking it to do. Given such an "imprimatur" by outside counsel, the Court does not believe it would be appropriate to sanction Countrywide for a knowing and willful violation of the discharge injunction.[17]

That still leaves open for question the *bona fides* of Countrywide's collection efforts pre-dating the referral to GMM on May 25, 2007. In many ways Countrywide's treatment of the Debtor during that period of time was unconscionable. There is no doubt it clearly caused her significant anxiety and distress. However, the Debtor has presumably been made whole as a result of the Settlement Agreement with Countrywide that was approved on August 12, 2008. In order to further sanction Countrywide for this same conduct, it is imperative that the UST demonstrate that such conduct was pervasive or systemic in Countrywide's treatment of its mortgagors. No such pattern of widespread misconduct was shown. At most, the UST showed that in several of the thousands of closed or pending Countrywide matters in this District, questionable actions were

---

[17] This result should in no way be considered a ruling or even a comment on the legal merits of the *Section 1322(b)(5)* theory. That theory has not been argued or briefed and in light of the Settlement Agreement does not represent a pending case or controversy before the Court.

taken. Such isolated instances do not a pattern make and are best addressed on a case-by-case basis as they arise.

For the above reasons, the Court declines to find that Countywide engaged in sanctionable conduct as described in this element of the *Rule*.

> **(3)** ***Countrywide intentionally, or with reckless disregard and/or indifference to the applicable facts, misleading the debtor's attorneys into believing change notices had been timely sent via the use of three "created" Payment Change Letters, when in fact they had not, and during such time attempting to resolve a dispute pending before this Court.***

Everyone now agrees that the three Payment Change Letters "created" after the fact were misleading and should not have been provided to the Debtor's attorney, at least not without a clear explanatory disclaimer so they could not be mistaken for copies of Letters actually sent. The Parties have offered competing versions of how the Letters came about. Countrywide argues that the Letters were mistakenly, but in good faith, created by a lower-level employee who thought they were the best way to convey information that had been requested by Countrywide's foreclosure attorneys, GMM. Countrywide asserts that there was no intent to deceive and that Countrywide management took reasonable steps to correct the mistake as soon as it was discovered. The UST paints a more sinister picture, arguing that perhaps the Payment Change Letters were deliberately created to mislead, or that at the very least, Countrywide and GMM took advantage of the situation by doing nothing to apprise the Debtor's counsel of the true nature of the Letters after they discovered "why" and "when" they were created.

Although the UST has raised some valid points concerning the Letters, after hearing and considering the evidence presented at trial the Court finds no evidence to support the contention that the Payment Change Letters were deliberately created by Countrywide with an intent to deceive the Debtor or her attorney.

Countrywide presented the testimony of Kimberly Hill by videotape deposition. The Court found her to be a credible witness. She testified that she was first hired by Countrywide in May 2005 as a customer service representative and at some point was transferred to the Bankruptcy Department where she worked on cases from Pennsylvania. In that capacity she dealt with Christopher Amann, the GMM paralegal, via e-mail exchanges.

On September 20, 2007, when Amann requested that she provide him with information about the Debtor's account, Ms. Hill thought the easiest way to do that would be by reviewing the escrow analysis pages for the loan in the Countrywide computer system and putting the information it revealed into a letter template she had been given for creating payment change notices.[18] She explained that the dates shown on each of the resulting Payment Change Letters were the dates of the corresponding escrow analysis and said she had to insert the other information that made the Letters look so real (e.g., the Debtor's name and address and "copied to" information) because otherwise the unrelated existing material from her letter template would appear in those areas instead. Kimberly Hill testified that she did not discuss the request from Amann, or her planned method of response, with anyone else at Countrywide. She said she did not check the

---

[18]     Kimberly Hill testified that the Debtor had a fixed-rate loan, so the only reason there would ever be for a payment change notice to issue would be as a result of an escrow analysis.

AS400 system to see whether payment change notices had actually been sent to the Debtor in connection with the escrow analyses because she did not think it was relevant to Amann's request.

There was no direct evidence presented to refute the testimony provided by Kimberly Hill concerning the creation of the Payment Change Letters. The UST pointed out that there were easier ways to provide the requested information to Amann, thereby implying that the choice of the Letters as the vehicle for doing so must have been accompanied by an intent to deceive. The Court agrees that the creation of the Letters was ill-advised, but in the absence of any evidence showing that Kimberly Hill was directed to do so by someone else, it will ascribe that decision to poor judgment on the part of a relatively junior employee. It is also telling that Kimberly Hill's 'signature' appeared on all three Letters, even though the first two were dated well before she had started to work for Countrywide. The Court finds this to be a further indication that there was no intent to deceive.

The UST also pointed out that information obtained during discovery from another case in this Court (*Karleski*, Case No. 04-31355-MBM) clearly showed that in 1999 Countrywide personnel discussed the need to "recreate" an "Act 91" letter, a statutorily required intent to foreclose notice that must be given before a foreclosure action can be pursued in Pennsylvania. Countrywide computer records from the *Karleski* loan revealed that a copy of an Act 91 letter needed to be sent to outside Countrywide attorneys so they could proceed with a foreclosure action, but the person from Countrywide who was working on the file could not find what she needed. She then suggested that the necessary document could be "recreated" and that approach was approved.

Countrywide witness John Smith testified that he was not with the company back in 1999, but that his understanding was that the policy at the time was to send outside counsel a copy of the original Act 91 letter along with the "green card" (i.e., certified mail return receipt). However, if an original Act 91 letter that had actually been sent could not be found, a copy of the 'screen shot' from the computer showing the information that was put into the letter and the date it was sent, together with a "recreated" letter and the green card, would be sent to the foreclosure attorney. (12/10 Tr. at 167 *et. seq*.). Smith testified that it was his understanding that it was made clear that any such recreated letter was not a copy of an original document although he didn't know if that was done by telling the attorney or by a notation to that effect placed on the recreated document. To counter Smith's testimony, the UST introduced Exhibit "EV," the state court foreclosure complaint from the *Karleski* case. It had the recreated letter attached with nothing on it to indicate that it was actually a recreated letter. Smith also testified that sometime after 1999 Countrywide began imaging and storing all Act 91 letters that are sent out so there is no need any longer to recreate letters as was done in *Karleski*.

The Court certainly cannot condone what Countrywide did in the *Karleski* matter, and based on Smith's testimony, perhaps in other Pennsylvania foreclosure actions as well. It would seem that at the very least Countrywide should have disclosed that the letter was a recreation of what it believed had been sent rather than leave the impression that it was a copy of the actual letter. That having been said, the Court fails to see how that evidence provides anything but the most tenuous support for the view that the creation of the Letters by Kimberly Hill in the present case was done with the intent to deceive. The recreated Act 91 letter in the *Karleski* matter was remote in time and

context from what happened here. The system notes from *Karleski* reveal that even if there was a policy at that time permitting the recreation of documents, it was not a mere matter of routine since the request to do so went up the chain of command for approval. The lack of any evidence to show that Kimberly Hill sought the approval of anyone else before creating the Payment Change Letters at issue here, supports the view that she acted on her own and not pursuant to any "routine" or policy approved by Countrywide.

The UST further argues that even if the Payment Change Letters were not originally created with the intent to deceive, Countrywide nevertheless took advantage of their existence once it discovered what had happened. Apparently, the UST's contention is that Countrywide knowingly allowed the Debtor and her attorney to labor under the misapprehension that the Payment Change Letters were copies of documents that had actually been sent. The Court is not persuaded by that argument.

The evidence shows that once Kimberly Hill's supervisors found out what had happened they promptly took steps to address the matter. Middleton directed Hook to speak to Kimberly Hill and to inform Puida about the Letters. Hook carried out these instructions. She spoke to Kimberly Hill on October 29, 2007 and she (Hill) was "written up" over the matter. Hook also informed Puida about the Letters. There was some disagreement as to the exact date when that occurred (discussed further, *infra*), but Puida herself admitted that she had been informed about the Letters. Once that was done, Countrywide had taken reasonable action to correct its error. In the absence of some evidence it had to the contrary, Countrywide was thereafter entitled to assume that its attorneys would act to correct any misunderstanding caused by the Letters, including if necessary to inform the Debtor's attorney that the Letters were not what they appeared to be.

The UST did not present any direct evidence to show that Countrywide had some knowledge that its attorneys had not so informed the Debtor's attorney. There are circumstantial facts that might support a conclusion that at least some Countrywide personnel should have suspected that information about the true nature of the Payment Change Letters had not been conveyed to the Debtor's attorney. There does not seem to have been any noticeable change in the Debtor's settlement posture after Puida was told about the Payment Change Letters, which might strike a thoughtful observer as curious. Nevertheless, that is not something that would necessarily lead one to conclude that no communication to the Debtor's attorney had therefore occurred. There are other possible, reasonable explanations for these occurrences, making the circumstantial evidence far from clear. The Court does not believe it appropriate to make a finding of egregious conduct and impose sanctions against Countrywide on the basis of ambiguous, circumstantial evidence and inferences.

> **(4)** *Countrywide intentionally, or with reckless disregard and/or indifference to the applicable facts, making misrepresentations to this Court in a pleading regarding the cause of its claimed escrow arrearages account regarding the Debtor.*

This aspect of the *Rule* relates to the *Motion to Quash Notices of Examination Under Fed.R.Bankr.P. 2004 and Subpoenas*, Misc. No. 07-204, Document No. 13, filed on November 9, 2007 by Countrywide ("Motion to Quash") in response to the UST's request for 2004 Examinations in this and nine other cases.[19] In regard to the Hill case, the *Motion to Quash* states:

---

[19] *See In re Countrywide Home Loans, Inc.*, 384 B.R. 373 (Bankr. W.D. Pa. 2009).

> Countrywide *believes* that the issues relating to the post-petition default are related to the chapter 13 trustee's and the debtor's failure to adjust payments post-petition despite having received proper notices of increases in post-petition mortgage payment from Countrywide.

*Id.* at ¶18 (emphasis added). All Parties now agree that the statement by Countrywide to the effect that the Debtor received proper notice of post-petition mortgage payment changes, is false. By the same token, the Parties strongly disagree as to whether by making such a representation, it rises to the level of sanctionable conduct against Countrywide.

The UST points out that the *Motion to Quash* was filed two weeks after the discovery by Middleton and Hook of Kimberly Hill's "creation" of the Payment Change Letters and urges that their knowledge be imputed to Countrywide. Countrywide argues that its personnel, who were involved with the preparation of the *Motion to Quash*, did not know about the true nature of the Payment Change Letters at the time the *Motion to Quash* was submitted. Countrywide also points out that the statement at issue in the *Motion to Quash* was qualified by the word "believes," signifying that it was making something less than a flat-out, factual allegation. Finally, Countrywide asks that, in mitigation, the Court take into consideration that it was being "battered" simultaneously on several fronts at the time the *Motion to Quash* was submitted, with the Chapter 13 Trustee having filed, only a short time earlier, motions in 293 cases in this District seeking loan histories from and sanctions against Countrywide accompanied by notices of examination and subpoenas also filed by the UST in a number of those cases.

The evidence presented at trial as to how this false allegation got into the *Motion to Quash* was somewhat murky. Smith testified that he "believed" there were "communications"

between his staff and the outside counsel who prepared the *Motion to Quash* to the effect that payment changes had occurred and notice had been provided to the Debtor and her counsel. 12/9 Tr. at 213-214. When asked by the Court to name the people at Countrywide who would potentially have communicated information to outside counsel regarding factual allegations in support of the *Motion to Quash*, Smith testified that it likely would have been limited to himself, Middleton, and Hook. *Id.* at 215-216. Smith's testimony in this regard was not consistent.

At one point in his testimony, Smith stated that he himself was not personally involved in communications to counsel regarding the Payment Change Letters, while later he stated that "counsel probably would have conferred with me as to my knowledge." *Compare, id.* at 214, 216. Unfortunately, for some reason at trial neither Hook nor Middleton was asked any questions related to this area so the Court is left with Smith's rather vague and uncertain recollection. Smith did testify that, although he now knows the allegation concerning notice of payment change to be false, at the time the *Motion to Quash* was filed the allegation was an accurate reflection of what he "believed." *Id.* at 216.

Additional evidence concerning the genesis of the false allegation in the *Motion to Quash* was provided by Townsend. He testified that although he did not draft the *Motion to Quash*, he did approve it. *Id.* at 254. Townsend stated that he relied upon Smith to provide the necessary information for the *Motion to Quash* and that the two exchanged comments about the subject in the days leading up to its filing. *Id.* at 254-56. He referred to a conference call between himself, Smith and Countrywide outside Counsel, Attorney Connop (and possibly Attorney Davis), prior to the filing of the *Motion to Quash* during which time it was reviewed. *Id.* at 256, 259-61. When further

pressed as to the source of the allegation concerning the Hill case, Townsend testified that he thought the October 24, 2007 e-mail from Puida to McKeever (UST Exhibit CA) which McKeever forwarded to Attorney Connop, was another basis for the allegation, along with whatever Smith and his group may have provided. *Id.* at 256-57 , 261.[20] With this evidentiary background in mind, the Court turns to a consideration of whether it is appropriate to impose sanctions against Countrywide for the false allegation contained in the *Motion to Quash*.

*Fed.R.Bankr.P. 9011*, a close analogue of *Fed.R.Civ.P. 11*, is intended to deter the filing of pleadings or other documents with frivolous legal arguments or questionable factual assertions. This *Rule* provides, *inter alia,* that by filing a pleading with the court an attorney or unrepresented party is certifying that, to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support, after a reasonable opportunity for further investigation or discovery. *Fed.R.Bankr.P. 9011(b)(3)*.

Sanctions under the *Rule* are based on an objective standard of reasonableness under the circumstances, and a showing of bad faith is not required. *Martin v. Brown*, 63 F.3d 1252, 1264 (3d Cir. 1995). The sanction process under the *Rule* can be initiated either by motion of the opposing party under *Rule 9011(c)(1)(A)*, or on the Court's initiative under *Rule 9011(c)(1)(B)* by

---

[20]   As indicated previously, p. 19 *infra*, Puida's e-mail appears to be a status report on the Hill case that was prepared in response to the actions of the Chapter 13 Trustee and the UST. In relevant part that e-mail states:

> It appears that the discrepancy between Countrywide's figures and the trustee/debtor's figures are payment changes that were sent to counsel for the debtor and the trustee. However, it does not appear that counsel for the debtor or the trustee made the necessary adjustments to the payments being sent to Countrywide.

the issuance of a show cause order. This portion of the present case is best viewed as a court-initiated sanction inquiry, with the *Rule to Show Cause* functioning as the order required pursuant to *Rule 9011(c)(1)(B)*.[21]

Based on the evidence of record, the Court finds that sanctions are appropriate here. It is undisputed that both Middleton and Hook knew the truth about the Payment Change Letters by October 26, 2007, two weeks before the *Motion to Quash* was filed by Countrywide. Furthermore, they were two of the four individuals at Countrywide who were identified as having had a "designated role" in gathering information to assist outside counsel in the preparation of the *Motion to Quash*. The fact that the material false allegation appeared in the *Motion to Quash* despite the knowledge of Middleton and Hook forces the Court to conclude that either (a) the misstatement was knowingly and intentionally included in the *Motion to Quash* with the intent to deceive the Court, or (b) the misstatement was included through reckless disregard or indifference to the facts because Middleton and Hook were not adequately consulted before the allegation was included and the *Motion to Quash* submitted.

An intentional deception, as under conclusion (a) above, would be so obviously a sufficient basis to support an imposition of sanctions as to require no further discussion. However, even conclusion (b) provides a sufficient basis to impose sanctions under the objective standard to be applied. It is simply inconceivable that any remotely reasonable inquiry into the facts could have failed to discover the falsity of the allegation in question. As indicated above, two of the four

---

[21]     As to this Item of the *Rule to Show Cause*, the Court declines to consider sanctions against Countrywide pursuant to its inherent power or under *Section 105(a)* of the Bankruptcy Code when *Rule 9011* is available for that very purpose.

Countrywide personnel assigned to gather information for the *Motion to Quash* knew about the Letters and would therefore have known the allegation being made was false. Even if the other two people involved, Smith and Townsend, believed in good faith that the allegation was true, it would at the very least be reckless not to seek the input of Middleton and Hook, who were the members of the group most closely involved with the Letters. Indeed, even if Middleton and Hook had not known the truth about the Letters, it would seem that any minimally reasonable inquiry in connection with the *Motion to Quash* would have included a review of the AS-400 file on the Hill loan, or an interview with Kimberly Hill whose signature appeared on the Letters, either of which would quickly have shown that no notices of payment change were ever sent. The Court thus has no difficulty concluding that sanctions are appropriate.[22]

The Court has considered the defenses, or justifications, advanced by Countrywide but does not find them persuasive. First, the inclusion of the word "believes" as a preface to the false allegation can in no way act as a shield for Countrywide. As noted previously, *Rule 9011* incorporates a standard of reasonable inquiry under the circumstances. The use of the word "believes" would thus necessarily imply a belief, after reasonable inquiry, which the Court has already found Countrywide failed to make.[23] *Rule 9011(b)(3)* does recognize that it may sometimes

---

[22] In the alternative, given the managerial positions of Middleton and Hook and their role in gathering information for the *Motion to Quash*, it would be permissible for the Court simply to impute their knowledge about the Letters to Countrywide. *See, e.g., Turner Constr. Co., v. Brian Trematore Plumbing & Heating*, 2009 WL 3334823 *4 (D.N.J. 2009).

[23] *Black's Law Dictionary* (9th ed. 2009) defines the word "believe" as "[t]o feel certain about the truth of; to accept as true." This is contrasted with the word "suspect," which is defined as to consider something probable or possible. *Id.* Similarly, the online *Oxford Dictionary* defines believe as to "feel sure of the truth of." *http://english.oxforddictionaries.com.* It is thus clear even under the customary usage of the term that to say one "believes" something, especially in the context of a court pleading, connotes near certainty as opposed to a mere probability or possibility.

be necessary for a party to make an allegation without yet having all the facts.  To do that the party must specifically identify the allegation as something likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.  Countrywide's use of the word "believes" was not sufficient to avail itself of this option under *Rule 9011(b)(3)* – and in any event – it is highly questionable that Countrywide could have done so in good faith given that it possessed the underlying information regarding the allegation about notice, readily at hand the entire time, and the means to obtain it upon appropriate, yet minimal inquiry.

Second, the fact that Countrywide was facing a number of actions simultaneously does not excuse the submission of the false allegation.  Countrywide is a large entity with extensive resources at its disposal.  No credible evidence was presented to show that it would have been impossible, or even unduly burdensome, for Countrywide to have complied with its *Rule 9011* obligations because those resources were being stretched beyond their capacity.  In fact, to the contrary, the evidence showed that Countrywide had the requisite information available at least two weeks earlier but nevertheless made the false allegation either deliberately or through reckless disregard or indifference.

One last point needs to be addressed before moving on.  Although typically a sanction under *Rule 9011* is imposed on the attorney who has signed the offending pleading, in this case the Court will impose a sanction against the client.[24]  As stated in a leading treatise with regard to the

---

[24]     The Court does not make any finding at this time as to whether *Rule 9011* sanctions should also be imposed against the Countrywide attorneys who signed and submitted the *Motion to Quash*.  Since the *Rule to Show Cause* does not name those attorneys, no procedure for sanctions under *Rule 9011(c)(1)(B)* has  been properly initiated by the Court or the UST against them.  Rather, in its *Amended Motion for Rule to Show Cause*, the UST chose only to seek relief against Countrywide and not its counsel.  Based on the current record, the Court will follow the UST's lead and focus on Countrywide, generally, in fashioning an appropriate remedy upon finding the existence of sanctionable conduct.

analogous *Fed.R.Civ.P. 11*:

> ...the district court's discretion under Federal Rule 11 includes the power to impose sanctions on the client alone, solely on the counsel for one of the parties, or on both of them because there are circumstances in which one of the courses of action is more appropriate than the other two....Conversely, sanctions should fall on the client rather than on counsel when the attorney has relied reasonably on the client's misrepresentations or the client's failure to disclose relevant facts-but the reliance by the attorney must be reasonable under the circumstances.

5A, Wright & Miller, *Federal Practice and Procedure* at §1336.2 (2010) (footnotes omitted). *See also*, 10 *Collier on Bankruptcy* at ¶9011.08[3][a] (2009) (represented party may be sanctioned under *Fed.R.Bankr.P. 9011*, depending on the client's involvement in the management of the litigation and the decisions that resulted in violation of the rule); *Fed.R.Bankr.P. 9011(c)(2)* (nature of sanctions).

The evidence showed extensive involvement by Countrywide in the preparation of the *Motion to Quash.* The fact that two of the Countrywide personnel who were most closely involved are attorneys themselves, Smith and Townsend, further bolsters the Court's conclusion in this regard. *See*, *e.g.*, *Continental Ins. Co. v. Construction Indus. Servs. Corp.*, 149 F.R.D. 451 (E.D.N.Y. 1993) (*Rule 11* imposes affirmative duty of reasonable inquiry on represented corporation employing members of bar). Having found the existence of sanctionable conduct, the Court is next faced with the question of what is an appropriate sanction.

The touchstone of the Court's consideration is found in *Fed.R.Bankr.P. 9011(c)(2)*, which provides that a sanction imposed for violation of the *Rule* shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Under the specific facts of this case the Court does not believe a monetary sanction is necessary to achieve that

goal.  Any monetary sanction the Court might reasonably impose would have minimal further effect on Countrywide, given the costs in attorney fees and settlement payments it has already incurred. The Court is inclined to believe that inclusion of the false statement here was the result of reckless disregard rather than an intentional deception.  While that does not shield Countrywide from sanctions, it does factor into the calculus of an appropriate sanction.  The Court thus intends that the findings made and published regarding this aspect of the case be viewed as a public censure of Countrywide and concludes that is a sufficient sanction against it for violation of *Rule 9011*. Countrywide is on notice that further instances of this type of misconduct coming before the Court will not so leniently be dealt with.

> **(5)** *Goldbeck McCafferty and McKeever and Leslie Puida knowingly and willfully, or with reckless disregard and/or indifference to the applicable facts, violating the discharge injunction granted to the debtor by making numerous and sustained attempts to collect on debt they knew to be discharged or should have known was discharged.*

Many of the points addressed in the discussion of Item 2 of the *Rule* are equally applicable here and will not be repeated.  The Court does note that on two occasions Judge Deller did inform local counsel for Countrywide that he had addressed the issue involving the effect of the *Cure Order* on mortgagees in previous cases.  He rather strongly suggested that Countrywide and its attorneys review those cases because, based on the information  being presented to him, he perceived that those decisions undermined Countrywide's position in defending the Debtor's *Motion to Enforce*.  Nothing was offered at trial to show that Countrywide's local counsel ever passed Judge Deller's comments on to Puida or to anyone else at GMM.  If he had done so, it would be

appropriate to expect Puida and GMM to have reviewed those cases and require them to account for any decision to continue to maintain the same legal position in the face of the cases.[25]   Since, according to her testimony, the Court must find that local counsel did not relay Judge Deller's comments, Puida and GMM will not be held to that standard.

Furthermore, although Puida and McKeever both testified at trial that the revelation about the Payment Change Letters did not affect their evaluation as to whether it was still appropriate to continue their collection efforts (because of the alternative *Section 1322(b)(5)* theory), their testimony in this regard was not entirely consistent.  In particular, McKeever acknowledged that as of October 26, 2007, the Payment Change Letters were the key to their theory of delinquency in the Hill case (not the *Section 1322(b)(5)* theory), and that it was "startling" when he learned the news about the Letters from Puida.  *See* 12/8 Tr. at 122, 135.

The following exchange then took place between McKeever and Counsel for the UST at which time McKeever never mentioned the *Section 1322(b)(5)* theory even though one would naturally have expected him to do so at this point in the proceeding:

| | |
|---|---|
| Counsel. | I am referring to, as you sat there in November 2007, when you learned these payment change letters had–were not sent out, there was no notice, that it was required under the rules, correct? |
| McKeever. | Yes. |
| Counsel. | So you understood without notice you couldn't ask for those increases anymore?  At that time, you understood that? |

---

[25]   It was disconcerting to hear at trial that even as of that late date, after being made aware of Judge Deller's comments,  Puida still had not read the cases to which Judge Deller referred, i.e., *Szalinski* and *Miller*.  *See 12/9 Tr at 337*.  The Court would have thought that after she finally learned that Judge Deller specifically mentioned the relevancy of these cases not just once, but twice, she would want to read them for her own professional edification, if for nothing else.   Although disappointing to the Court, this failure is not a factor that has been considered in the decision whether to impose sanctions under the *Rule*.

| McKeever. | Yes. |
| Counsel. | So you understood at that time, you could no longer collect this debt, this delinquency from Ms. Hill? |
| McKeever. | Well, I understood at that time that we were having negotiations with Mr. Steidl. He didn't raise the issue that it would not be collectable, and he was negotiating a number. |

12/8 Tr. at 143-44. Subsequently, McKeever did seem to soften this testimony somewhat by again pointing to *Section 1322(b)(5)* as an alternative theory (*Id.* at 145). Nevertheless, it is difficult to draw any other conclusion from the quoted testimony but that GMM continued the collection efforts even after the original basis for doing so had collapsed primarily because of Mr. Steidl's non-reaction to the news about the Payment Change Letters. Of course, that presumes that Mr. Steidl was in fact told about the Letters, something that is addressed in the next section of this *Opinion* and resolved unfavorably to the position of GMM and Puida in that the Court concludes Mr. Steidl was not told about the Payment Change Letters.

It should be apparent from the discussion above that the Court does harbor some doubts as to whether GMM and Puida actually thought they possessed a solid, legal basis to continue to pursue collection efforts against Hill once they learned the Payment Change Letters had not been sent. Nevertheless, these doubts do not rise to the level where the Court is prepared to find that the UST has met her burden of proof as to Item 5 of the *Rule*.

> **(6)** **_Goldbeck McCafferty and McKeever and Leslie Puida intentionally, or with reckless disregard and/or indifference to the applicable facts, failed to disclose to the debtor's attorney that three Payment Change Letters had never actually been sent, all in an improper attempt to collect on questionable debt while attempting to resolve a matter that was pending before this Court._**

It is admitted by Puida that Countrywide personnel informed her that the Letters had never actually been sent, although there is some dispute about exactly when that discussion happened. (*See* 12/9 Tr. at 77-84; 390, 393). The relevant issue underlying this element of the *Rule* is whether Puida, in turn, then informed the Debtor's attorney about the Letters. There is absolutely no documentary evidence memorializing such an event so the Court is forced to reach a finding of fact based primarily on the testimony of Puida and Mr. Steidl – the only two people who know for sure whether Puida ever said anything, as well as whatever circumstantial evidence may be available.

There was a stark and seemingly irreconcilable disagreement at the trial in the testimony on this point. Puida testified that after she learned about the Payment Change Letters from Hook she spoke with McKeever, who told her to immediately call Mr. Steidl. (12/9 Tr. at 395). She said at first she was unable to reach him but she finally contacted him by telephone at which time she told him the Payment Change Letters were recent creations. She was unable to give the date when this occurred, other than to say she thought it was after October 30th, shortly after her conversation with Hook. (*Id.* at 398). She could not say what time of day the call took place and made no memorandum of any type to document it. (*Id.*)[26] Puida claimed the call in question was made "proactively" for the specific purpose of telling Mr. Steidl about the Payment Change Letters. (*Id.* at 402-03). She testified that in a previous conversation with Mr. Steidl he had indicated to her that he could not find the Letters in his files. When she made this proactive call she referred to that prior conversation and then explained to him why the Letters were not in his file. Puida summarized

---

[26]    At trial the Court inquired whether there were any telephone records to show that such a telephone call from Puida to Steidl occurred during the week from October 30-November 6 and was told by Puida's counsel that "[w]e didn't pull any phone records. That wasn't part of the discovery." Puida testified that the call was made from her office. (12/9 at 401).

the content of the discussion as follows:

> I had told him that the letters hadn't been sent, that they were merely meant to show payment changes that had occurred on those dates. And he said okay. He wasn't giving me an argument or anything about them. And that was all there was to that conversation. Then we continued to try and resolve the motion.

(12/9 Tr. at 412).

Mr. Steidl's testimony was that he received a fax from Puida's office on October 25, 2007, which included the Payment Change Letters as attachments, coinciding with the opening of settlement discussions in the case. (12/7 Tr. at 158). He believed the Letters were real and checked his file carefully but could not find them. He forwarded copies of the Letters to the Debtor on October 26th, informing her that Countrywide had just provided them to him but he did not have them in his file, and asking whether she had them. The Debtor said she did not have the Letters in her documents, nor did the Chapter 13 Trustee possess them after he checked with her office. Mr. Steidl testified he believed the Letters to be real and never informed Puida that he did not have them in his file.

Mr. Steidl was adamant that Puida never told him that the Letters were not what they purported to be. He was able to pinpoint to within 5 minutes of when he first became aware that there might be a question about the legitimacy of the Payment Change Letters. He testified that happened between 8:20 a.m. and 8:25 a.m. on December 20, 2007 while his wife and law partner, Julie Steidl, was in a separate room at the firm's offices reviewing the Debtor's file in preparation for a hearing later that day on the *Motion to Enforce*.

At that time Ms. Steidl happened to notice that the earliest of the three Payment Change Letters might predate the firm's move to its current address, which piqued her interest because it showed the current address on the letter. She called out to her husband asking what date they had moved to the new address. Mr. Steidl testified that his exact words in response were "[w]hat the hell difference does that make?" After Ms. Steidl said "just tell me," Mr. Steidl informed her that the firm had not moved to the current address until October 24, 2003 and it had not received any mail at that address prior to that date. Ms. Steidl then pointed out to him that the first letter was dated September 22, 2003, yet showed that it had been sent to the firm at the current address. Mr. Steidl responded that this discrepancy was "really interesting" and asked Ms. Steidl to inquire about it at the hearing.

There was general agreement that Ms. Steidl did make an inquiry to Puida about the Payment Change Letters when they met each other just prior to the hearing, although there was some conflict in the testimony as to exactly what was said. It is, of course, a matter of record that Ms. Steidl raised the question about the Letters at the December 20th hearing and it was clear to the Court at that time that she was truly perplexed about them.

The Court is left to determine what really happened regarding the communications between Puida and the Debtor's attorneys. Based on its evaluation of the evidence presented, the Court concludes GMM and Puida did not inform the Debtor's attorney about the true nature of the three Payment Change Letters prior to December 20, 2007. Because of the obvious gravity of this finding as to those parties, the Court will provide some detail to explain how it arrived at this conclusion.

As a starting point, the Court finds that Puida and GMM bear the burden of proof on the issue of whether the Debtor's counsel was informed about the true status of the Payment Change Letters. They acknowledge that they originally provided the false and misleading Letters to the Debtor's counsel during the course of the bankruptcy court litigation even though they did not realize the true nature of the Letters at the time. They further fully acknowledge that at some point thereafter they were made aware of the true nature of the Letters. As a means of ameliorating what had been done, they contend that the Debtor's counsel was informed about the Letters. This position is in the nature of an affirmative defense, and in accordance with the well-recognized general rule, the party asserting such a defense bears the burden of proof on it. *See, Taylor v. Sturgell,* 553 U.S. 880, 907 (2008), *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 428 (2d Cir. 1999) (law places the burden of proof on the party that asserts a contention and seeks to benefit from it). Furthermore, evidence as to whether Puida informed Mr. Steidl about the Letters, if in fact it exists, is something that would be within the control of Puida and GMM rather than the UST, which provides another reason to place the burden of proof as to this issue on them. *United States v. Santee Sioux*, 254 F.3d 728, 733 (8th Cir. 2001) (when the true facts relating to a disputed issue lie peculiarly within the knowledge of one party it is fair to assign the burden of proof to that party). With that conclusion as to the burden of proof in mind, the Court turns to a closer review of the evidence.

On the most basic level, the Court simply found Mr. Steidl to be a more credible witness than Puida regarding this point. He was very clear that he had never been told about the Letters and he gave a detailed and believable explanation as to how he became aware for the first

time on the morning of December 20th that there might be a question as to their authenticity. He testified to a previous, good-working relationship with Puida. No apparent motive has been demonstrated for him to be untruthful on the question of whether he was ever informed by her about the Letters.

On the other hand, although consistently maintaining that she did in fact inform Mr. Steidll about the Payment Change Letters, Puida's testimony was vague on when the supposed conversation took place and the circumstances surrounding it. She has long been on notice as to the importance of the conversation she supposedly had with Mr. Steidl wherein the nature of the Letters was disclosed to him. But at trial, she still could not provide the date or even a time of day, on which the conversation took place beyond a very rough approximation.

Puida's general credibility as a witness was damaged by other, more peripheral areas of her testimony as well. For instance, the Court did not find her testimony to be credible on the topic of why, in another case in this Court in which it represented Countrywide, GMM made a business decision to fully assume responsibility to pay a sanction itself without informing Countrywide of that or of any other circumstances surrounding the issue. *See* 12/09 Tr. at 284-315.

The Court also found Puida's credibility lacking in regards to her response to questions going to the "heightened importance," in late October through December of 2007, of the Hill case to both Countrywide and GMM once the Chapter 13 Trustee and UST proceedings were started. It is obvious to the Court, based on all the evidence presented, that the Hill case became an extremely important matter to all associated with Countrywide. At that point, under the circumstances, there was nothing wrong with such a realization. However, rather than freely

concede the point, Puida only grudgingly acknowledged the obvious after continued prodding. *See* 12/9 Tr. at 353-354.

The Court is also troubled by the representation Puida made to Countrywide on October 26th that she had "resent" materials, including the Letter, to Mr. Steidl. There was no evidence that the materials had ever previously been sent to Mr. Steidl and in fact the facsimile from Puida to Mr. Steidl which accompanied the materials said nothing about being a "resend." The Court is then left to conclude that Puida was not being candid about this, further damaging her credibility with the Court.

Finding a lack of credibility as to the foregoing matters, the Court assesses Puida's overall credibility in light thereof. *See Bennun v. Rutgers State Univ.*, 941 F.2d 154, 179 (3d Cir. 1991) (when court is the finder of fact it may apply the principle of *falsus in uno, falsus in omnibus*). Further undermining her credibility, Puida's trial testimony concerning the purported conversation with Mr. Steidl conflicted with statements she made to the Court at the December 20th hearing. At that earlier hearing she stated as follows in response to a question from the Court as to when she had told Mr. Steidl that the Payment Change Letters, on their face, were not what they appeared to be:

> Your Honor, I wouldn't be able to give you an exact date. I had a conversation with Mr Steidl where he indicated that he had never received the letter. He had checked his file, and I told him, well, you wouldn't have, because this was – these were not sent out.

*Tr.* of 12/20/07 Hrg. at 11-12, Ex. DU. The Court understood this to be a reference to the contents of a single conversation wherein Mr. Steidl commented about not having received the Letters and Puida responded to explain why. However, at trial Puida testified to two separate conversations.

She stated that Mr. Steidl had told her during a prior conversation that he did not have the Letters, and then, when at some later time after she learned from Hook that the Letters were not real, she called Mr. Steidl for the specific purpose of telling him about them. 12/9 Tr. at 402-03.

When confronted with this apparent discrepancy at trial, Puida testified that she should have been "more precise" at the December 20th hearing, but she had really meant that there had been two conversations separated in time. The Court does not find this explanation to be credible. There was absolutely nothing in the statement by Puida at the December 20th hearing that would indicate that the crucial event of her learning the truth about the Letters from Hook intervened between Mr. Steidl's comment that he did not have the Letters in the file and her telling him that they had never been sent.[27]

There are other factors that lead the Court to reach the conclusion that Puida did not inform Mr. Steidl that the Letters were other than what they appeared to be. One is the complete lack of documentation to provide any evidence of the purported conversation. An attorney, who by her own admission held out false letters to opposing counsel as being real (12/9 Tr. at 374), even if innocently so, and then subsequently becomes aware of their falsity, is in an ethically tenuous position. In such circumstances the attorney has an obligation to correct matters by informing opposing counsel. *See Fed.R.Bankr.P. 7026*, incorporating *Fed.R.Civ.P. 26(e)(1)(A)* (requirement to correct a response to a discovery request later learned to be incorrect); *Fed.R.Bankr.P. 7037*, incorporating *Fed.R.Civ.P. 37(c)(1)* (sanctions for failure to provide corrective information); *Pa.*

---

[27] Lest it be thought that Puida was not on notice at the December 20th hearing that her statements to the Court on this issue were very important and therefore needed to be "precise," the Court notes that its question to her, which elicited the quoted response, included the following: "I want you to be totally candid with me, because I'm going to ask these questions of Mr. Steidl as well at some point."

*Rules of Professional Conduct 4.1* (lawyer may not knowingly make false statement of material fact to a third person).

Given the level of seriousness involved, the Court believes that most attorneys facing a similar situation would make the correction to opposing counsel in writing, or confirm it in a writing following a phone call if speed was of the essence. Or, at the very least, place a note or memo in the file to provide some evidence that the correction had been made. Similarly, there is no documentary evidence of any kind to memorialize the purported meeting between Puida and McKeever during which she allegedly informed him about the Letters. The evidence does show that the Hill case was a high-priority matter by the end of October 2007 and that Puida and McKeever were extensively communicating with each other about it by e-mail. Despite that, there is no reference in any of these communications about Puida learning the truth about the Letters or telling McKeever that she had told Mr. Steidl about them. The inability of Puida or GMM to produce any documentary evidence in this regard is another negative factor in weighing their credibility.[28]

In weighing Puida's credibility, it is also instructive to compare the lack of documentary evidence to support the GMM/Puida position with the available documentary evidence from Mr. Steidl. The evidence clearly established that it was his regular practice to communicate with the Debtor via letter. When he received the Payment Change Letters from Puida on October 25th he promptly forwarded them to the Debtor the next day and specifically noted in his

---

[28] Countrywide's case also featured a lack of documentation demonstrating that Hook had in fact called Puida to tell her the Letters were false. Hook herself acknowledged this was a significant event which should have been documented in the Countrywide AS400 system. Had Puida denied ever being told about the Letters by Hook, the Court would have likely weighed that lack of documentation by Countrywide in the credibility balance. However, since Puida admitted that Hook did tell her, the lack of documentation by Countrywide is of little moment.

accompanying letter to the Debtor that he did not have copies of them in his file.  He asked the Debtor to look to see if she had copies of the Letters.  According to Puida's testimony, Mr. Steidl would have been told by her about the true nature of the Letters fairly soon thereafter but there is nothing in any of his subsequent Letters to the Debtor to that effect.  It would seem natural that an attorney who had bothered to inform his client in the first instance about not having the Letters in his possession would likewise inform that client if and when he discovered the reason why they were not in his possession (and thus, would not be in hers either).  The lack of any such communication from Mr. Steidl to the Debtor further confirms the Court's conclusion that prior to December 20th, Mr. Steidl  was not told the truth about the Letters.

Not only is there a lack of documentary evidence to support the contention that Puida informed Mr. Steidl, there was no supporting oral testimony from anyone else other than  McKeever. He  testified that Puida told him  she had spoken with Mr. Steidl about the Payment Change Letters, but he was very vague as to when this conversation took place.  (12/8 Tr at 157-58).  On the other hand,  Hook testified that Puida never told her that she had communicated with Mr. Steidl and informed him of the true nature of the Letters (12/9 Tr. at 129).  McKeever acknowledged that he does not know if anyone at Countrywide was ever told that Puida had spoken with Mr. Steidl about the Letters. (12/8 Tr. at 160).  Ms. Steidl testified that when she asked Puida about the Letters prior to the December 20th hearing, Puida did not tell her that she had told Mr. Steidl about them. (*Id.* at 19).

Another factor that contributed to the Court's conclusion is the  lack of any evidence showing a change in attitude or approach on the part of the Debtor and her attorney after the

disclosure was supposedly made. Countrywide, acting through Puida and GMM, continued to pursue a settlement on the basis that the Debtor had been given notice of the changes in her mortgage payments and Mr. Steidl continued to respond in a manner which seemed to acknowledge that notice had been given, only questioning the amount of the changes. Even though at trial both the Respondents and Mr. Steidl expressed the view that there still might have been a basis for Countrywide's claim even in the absence of proper notice of payment changes having been given, it was clear that the appearance that notice had been given was a significant factor in how the Parties viewed the case. *See* 12/7 Tr at 204, 231 (Mr. Steidl testimony as to importance of the Letters in his negotiations); 12/8 Tr at 135 (McKeever testimony as to significance of Letters). A bombshell going off during settlement negotiations to the effect that the Letters were actually "phonies" would be expected to leave some evidence behind – an expression of outrage from Debtor's counsel at having been misled, a sudden change in settlement posture – but the Court sees none in this record. The most logical explanation for the absence of any such evidence is that the bombshell never went off.

In reaching its decision on this Item of the *Rule*, the Court is also mindful of the possible motives of the Parties. There is no obvious reason for Mr. Steidl to be untruthful in his testimony that Puida never informed him about the Letters. Both he and Ms. Steidl testified to a good, prior working relationship with Puida, so personal animus is ruled out. Mr. Steidl candidly testified that one of his major concerns upon being presented with the Letters by Puida was that he had somehow erred by not amending the Debtor's Chapter 13 plan to increase the monthly payments to reflect the changes noted in the Letters. He thought that this perceived error on his part would make him responsible for the shortfall that Countrywide was seeking. A revelation that the Letters

were false would thus, in a sense, have been welcome news for him.  Certainly there would be no

reason for him to hide such news from the Debtor or to provide false testimony denying he had been

told about the Letters.

On the other hand, there are a number of possible motives for Puida and GMM to fail

to make the disclosure.  Perhaps they thought that making the disclosure would diminish the

prospects of settling the case  –  at a time when they were under intense pressure from one of their

largest clients to settle in order to bolster the lack of standing argument being made in the Chapter

13 Trustee and UST matter.[29]  Possibly, because matters had progressed so far, and due to their

"good, working relationship" with Mr. Steidl they believed the matter would be settled and were just

uncomfortable with the prospect of having to explain and apologize to Debtor's counsel, finding it

easier to avoid that unpleasant task altogether by not mentioning the Letters.  Conceivably, once the

matter heated up in late October, Puida realized that copies of the Letters and the payment history

had never been previously forwarded to Mr. Steidl in September when GMM received them from

Countrywide.  Or perhaps, to avoid the embarrassment of admitting that failure to GMM's client,

Puida instead misrepresented to Countrywide that she had to "resend" the materials – with the

---

[29]     In his closing argument, Counsel for the UST also commented on possible "incentives" that Puida
and GMM would have had not to tell Mr. Steidl about the Letters.  In addition to the potential motives mentioned in
this *Opinion* by the Court, Counsel pointed out that a disclosure to Mr. Steidl would have introduced an unwanted
element of uncertainty into the settlement discussions because Puida/GMM could not have known how Mr. Steidl
might react to such news – for example, he might inform the Court.  Counsel also pointed out that the timing of the
revelation about the Letter could not have been worse for Countrywide, given the nearly contemporaneous filings by
the Chapter 13 Trustee and the UST concerning Countrywide and suggested that as another possible reason why
Puida/GMM would choose not to inform Mr. Steidl.  The Court certainly views these as other plausible motives
underlying the failure to disclose.

deception escalating from there.[30]

To make a finding under Item 6 of the *Rule*, proof of a motive is not specifically required. Therefore, the Court need not consider the actual motive(s) of GMM and Puida in failing to address the issue with Mr. Steidl. Nevertheless, possible motives clearly exist.

For all of the above reasons, the Court must reluctantly conclude that GMM and Puida failed to disclose the true nature of the Payment Change Letters to Mr. Steidl. The Court must further conclude that they did so intentionally, or with reckless disregard, because an alternative explanation of failure based on mere negligence or inadvertence is simply not plausible.

> *(7)*   *Goldbeck McCafferty and McKeever and Leslie Puida intentionally, or with reckless disregard and/or indifference to the applicable facts, made inaccurate oral statements in response to the Court's inquiry regarding when Leslie Puida told the Debtor's attorney that the three Payment Change Letters were not what they purported to be, but instead were memoranda created years after the event.*

The underlying issue involved in deciding this aspect of the *Rule* concerns Puida's statements to the Court at the December 20, 2007 hearing when questions regarding the Payment Change Letters were raised by Ms. Steidl. It is beyond dispute even by GMM and Puida, that a number of statements made by Puida at that hearing were factually untrue:

> ● "Your Honor, regarding the letters, they were never held out to be letters that were sent notifying anyone of payment changes." (12/20/2007 Tr. at 9: 24- 10:1).

---

[30]   This last scenario would explain the curious omission from Puida's October 26th 2:05 P.M. e-mail to Countrywide of the report in the 1:03 P.M. email to McKeever that Steidl stated he did not have the Letters in his file.

- "The letters again were never offered as being something that was sent out to debtor's counsel or to the Trustee." (*Id.* at 19:16-18).

- "Throughout my discussions with Mr. Steidl when we were trying to resolve this matter." (Id. at 10: 24-25 (stated in response to a question from the Court as to when she had disclosed that the Letters were not what they appeared to be)).

The first and second of these statements are demonstrably false based on Puida's own trial testimony. She testified at trial that the Letters were initially held out as having been sent as indicated, something she herself believed to be true at the time. (*See* 12/9 Tr. at 374-75). Further confirmation of the falsity of these two statements comes from the cover sheet which Puida sent to Mr. Steidl accompanying the Payment Change Letters which clearly implies they were "real" and meant to be viewed in that way. (*See*, UST Ex. BZ)

The third statement in the above list is false because Puida testified at trial that there was but a single conversation during which she supposedly told Mr. Steidl about the Letters, whereas the statement made on December 20th clearly indicates repeated representations of this type were made "throughout" the extended settlement negotiations with Mr. Steidl. (*See* 12/10 Tr. at 12-13). Additionally, based on the Court's finding above to the effect that Mr. Steidl was not informed of the true nature of the Letters until December 20th, at least one other statement made by Puida at the December 20, 2007 hearing was not true. This misrepresentation occurred when Puida stated:

"I had a conversation with Mr. Steidl where he indicated that he had never received the letter. He had checked his file and I had told him, well, you wouldn't have, because this was – these were not sent out."

(*See* 12/20/2007 Tr. at 12:1-4)

Taking the falsity of Puida's statements as given, the question for the Court here under the *Rule* is whether those statements were made deliberately or with reckless disregard. At trial, Puida would only acknowledge that she "should have been more precise" in her statements at the December 20th hearing. (12/10 Tr. at 407). She further said she only came to that realization after she saw a copy of the transcript from the hearing. (*Id.* at 409). In other words, it appears that Puida seeks a conclusion that she may have acted carelessly, but innocently, in responding to the Court, with no intent to deceive. After careful consideration the Court rejects such a conclusion.

As pointed out above, at the December 20th hearing the Court was very direct with Puida and instructed her that she should answer carefully and candidly because it was clear even then that the subject of the Payment Change Letters was significant and the Court would inevitably at some point be asking the same questions of Mr. Steidl. Moreover, the subject of the Letters had come up twice previously on the same date of the hearing – once by Puida herself at a meeting at the office of Countrywide's counsel and once when Puida and Ms. Steidl spoke in the hallway. This was not, then, a situation where Puida was somehow caught off guard with a totally unanticipated line of questions, or where she was in any way misled by the Court as to the significance that would be placed on her answers to its questions. Furthermore, since the alleged conversation(s) occurred relatively close in time to the December 20th hearing, it is fair to conclude that Puida's memory of the events would be more clear and distinct then her memory months or even years later at trial.

Puida's contention that she only realized the inaccuracy of her statements after she saw the transcript from the hearing also rings hollow. The transcript from the hearing was requested

by the UST the very next day and the completed transcript was docketed on January 7, 2008. *See* Document No. 107. The filing receipt for the transcript shows that electronic notice of the filing was sent to Puida. Once Puida read the transcript and realized she had made false statements to the Court, she was under a duty to take remedial action by informing the Court as to any misstatements. *See Pa. Rules of Professional Conduct 3.3(a)(1)* (lawyer shall not knowingly make a false statement of material fact to a tribunal or fail to correct a false statement of material fact previously made by the lawyer). Had Puida been acting in good faith the Court would have expected a prompt correction once she reviewed the transcript, but that was not forthcoming.

When this point was raised at trial, Puida responded that she did not read the transcript until she was being represented by counsel in this matter and acted on advice of counsel in not advising the Court about the misrepresentations at the December 20th hearing. (12/9 Tr at 409-10). The Court rejects this excuse for several reasons.

First, no attorney even sought to enter an appearance on behalf of Puida and GMM until July 14, 2008 (shortly after the UST filed its *Motion for Rule to Show Cause* on June 23, 2008), which was more than six months after the transcript was filed. The Court finds it difficult to believe that Puida did not read the transcript of the December 20th hearing until after she was being represented by counsel in this matter. The hearing was a dramatic event that received considerable notoriety and Puida was at the center of the firestorm. The Court believes she must have read the transcript as soon as it became available. Second, even assuming she did not read the transcript until after she was being represented by counsel who advised her not to take remedial action, the Court does not believe that can excuse her obligation to do so as an officer of the Court under the *PA Rules of Professional Conduct*.

For the above reasons, the Court concludes that Puida intentionally, or at least with reckless disregard, made inaccurate statements at the December 20th hearing.

### (B) Beyond the Rule to Show Cause: Attorney Misconduct Arising During the Trial

In addition to the particular points raised in the *Rule*, several other areas of potential misconduct came to the Court's attention during the trial that now require comment. One involved the deposition testimony of Charles Townsend, Assistant General Counsel of Countrywide, that was read into the record by the UST during her case.

In this testimony Counsel for the UST questioned Townsend closely about his role, if any, in attempting to settle the Hill matter, particularly during the period of late October 2007, when there was a flurry of activity in that regard following the filings by the Chapter 13 Trustee and the UST. Townsend testified that he "did not have a role in that litigation" (meaning the current matter) and "had no role in the motion to enforce discharge litigation." 12/9 Tr. at 230-31. When asked specifically about any involvement in settlement negotiations in Hill during the October 24-26th period, Townsend responded that he "had no participation in negotiations or parameters." He further testified that despite his position with Countrywide, he did not need to be informed of, or approve, any settlement in the Hill matter. *Id.* at 252-53.

At the conclusion of Townsend's testimony, the Court was thus left with the clear impression that Townsend was not involved in any way with the Hill case and the focused efforts to get it settled. There was no documentary or other evidence to the contrary, so the Court did not

even consider the extent of Townsend's involvement in the Hill settlement effort to be at issue. However, in the evening, at the very end of the third day of trial, Countrywide's attorney asked questions of Puida that resulted in the Court ruling Countrywide had "opened the door" for admitting into evidence certain e-mails that, up to that point, had been the subject of a privilege claim by Countrywide and thus not available to the UST or the Court.[31]

These formerly-privileged e-mails paint a far different picture of Townsend's involvement in Hill than did his testimony. For instance, Court Exhibit 6 is a series of e-mails between McKeever and Townsend from the afternoon of October 25th. In the first one, Townsend asks McKeever to try to get the October 31st hearing on the motion in Hill continued for a few weeks so "we can try to do a workout". He further asks McKeever to let him know about the possible continuance by the next day because if the hearing is not continued "we need to formulate a strategy for the hearing." In his reply, McKeever assures Townsend that "[w]e won't settle any of it without your input."

Court Exhibit 8 is another series of e-mails, this one from the afternoon of October 30th. The first is an e-mail from Townsend to Puida, with copies going to several other people, including McKeever, with the simple message: "Any updates?" McKeever responded to that e-mail by reporting (erroneously) to Townsend that the matter had been resolved and Hook had received

---

[31] Pursuant to a Pretrial Order, Countrywide had previously been directed to set aside the emails in a "privilege file" so that at the time of Trial, in case their privileged status became an issue, they would be immediately available. Based on the line of questioning by Countrywide's attorney, the Court directed the entirety of the emails to be turned over. Thereafter, a member of the Court's staff reviewed them prior to the start of the fourth day of trial and provided a summary to the Court of those possibly relevant to the Townsend issue. The Court ultimately ruled that eight of these e-mails should be disclosed to the UST and made available for use at trial. These e-mails were marked as Court Exhibits 1-8.

the details. McKeever concluded by asking whether "you or Lord Locke [Countrywide's outside counsel in the UST *Rule 2004* Notice matter at the time] want to review the stip?" Townsend replies "Both of us."

Based on these e-mails, and the assumption that Townsend reviewed them and other relevant materials prior to the deposition so that his memory was well-refreshed,[32] the only conclusion the Court can draw is that he was being deliberately misleading in his testimony as to the nature of his involvement in the Hill matter and the attempt to settle the *Motion*. But for the happenstance of the admission of the formerly privileged e-mails the Court may never have become aware of the deception. In addition to the obvious impropriety of Townsend providing misleading testimony, this is troubling because clearly counsel for some of the parties were aware of the content of the e-mails and had to know that Townsend was misleading the Court, but did nothing to bring it to the Court's attention.

First, as to Townsend himself, the Court concludes that something must be done in response to his misleading testimony. Townsend was not just another witness in the case. He is an attorney, an officer of the Court, who actually entered an appearance on behalf of Countrywide in

---

[32] Countrywide vigorously opposed the effort by the UST to depose Townsend on attorney-client privilege grounds, filing a motion to quash a subpoena that the UST had served. *See* Document No. 308. The matter was heavily litigated, being the subject of several arguments and orders by the Court and a supplemental filing by Countrywide. *See* Document Nos. 368, 379, 430. The Court ultimately denied Countrywide's motion and allowed the deposition to go forward with certain safeguards. For present purposes, given the obvious sensitivity of Countrywide to Townsend being deposed, the Court has no doubt that he was well prepared for the deposition.

this case.[33]  As such, the Court is not inclined to take the easy path and look the other way

concerning, at best, the lack of candor of his testimony.  Townsend will be required to appear before

this Court to personally explain his conduct so a determination can be made as to whether sanctions

should be imposed against him or this matter should be referred to the proper disciplinary

authorities.

The apparent falsity of the Townsend testimony, and the failure to make any effort

to correct it, implicates the professional responsibilities of other attorneys in the case as well – those

who had knowledge of the previously privileged but as yet undisclosed e-mails evidencing

Townsend's participation in the October 2007 events.  At the very least when the deposition

testimony was offered, counsel should have alerted the Court as to its inaccuracies.  An attorney's

"loyalty to the Court, as an officer thereof, demands integrity and honest dealing with the Court.

And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the

Court."  *In re Ocon*, 2007 WL 781233 *3 (Bankr. S.D. Fla. 2007) quoting *Kupferman v. Consol.*

*Research & Mfg. Corp.,* 459 F.2d 1072, 1078 (2d Cir. 1972).  Fraud on the court "is  a

wrong…which….cannot complacently be tolerated consistently with the good order of

society…involv[ing] two victims:  the individual litigant… and the court itself, whose integrity is

---

[33]     The Court considers Townsend to have appeared for Countrywide in this case even though he did
not sign any pleadings or enter a formal appearance.  The *Amended Motion to Quash*, Document No. 308,  which
Countrywide filed in an effort to keep Townsend from being deposed by the UST states that Townsend "had specific
responsibility for representing Countrywide in connection with the Hill case."  Id. at ¶22.  At hearings on this *Motion
to Quash* Townsend appeared and sat at counsel table with the other Countrywide attorneys, and when the Court
asked for the entry of appearances of attorneys at these hearings Townsend's name was given.  *See* Tr. of 11/26/2008
Hrg. at 6, Document No. 399, Tr. of 1/26/2009 Hrg. at 6, Document No. 439.  The Court made clear at both of these
hearings that it viewed Townsend as having entered an appearance as an attorney for Countrywide in the case, at one
point explicitly stating that it had jurisdiction over him as a result.  *See* Tr. of 11/26/2008 Hrg. at 10, 18, Tr. of
1/26/2009 Hrg. At 36-37.  There was never any response or objection from Townsend or anyone else disputing the
Court's view in that regard.

compromised by the fraudulent behavior of its officers." *Hazel-Atlas Glass Co. v. Hartford Empire Co.,* 322 U. S. 238, 246 (1944). "The very temple of justice [is] defiled." *Universal Oil Prods. v. Root Ref. Co.,* 328 U. S. 575, 580 (1946). "If our adversary system is to function according to design, we must assume that an attorney will observe his responsibilities to the legal system as well as to [the] client." *Geders v. United States,* 425 U. S. 80, 93 (1976).

The Pennsylvania *Rules of Professional Conduct, Rule 3.3* provides that:

A lawyer shall not knowingly:
…
(3) Offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence before a tribunal or in an ancillary proceeding conducted pursuant to a tribunal's adjudicative authority, such as a deposition, and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. …

*Pa.R.P.C. 3.3.*

*Rule 3.3, cmt. 2* provides in part, that "[t]his Rule sets forth the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process. ……. [T]he lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false."

*Rule 3.3, cmt. 10* discusses remedial measures. It provides in part, "if the lawyer knows of the falsity of testimony elicited from the client during a deposition, the lawyer must take reasonable remedial measures. In such situations, the advocate's proper course is to remonstrate with the client confidentially, advise the client of the lawyer's duty of candor to the tribunal and seek the client's cooperation with respect to the withdrawal or correction of the false statements or

evidence.  If that fails, the advocate must take further remedial action.  If withdrawal from the representation is not permitted or will not undo the effect of the false evidence, the advocate must make such disclosure to the tribunal as is reasonably necessary to remedy the situation…".  *See also Pa. R.P.C. 1.6*

It appears to the Court that counsel, with knowledge of the misleading Townsend testimony, had a duty to take some remedial action respecting it, even though that could potentially require divulging attorney-client privileged material.  For instance, in a somewhat similar circumstance, the Honorable R. Stanton Wettick, a highly-regarded judge of the Allegheny County, PA, Court of Common Pleas, stated:

> An attorney who claims the [attorney/client] privilege on behalf of a client cannot do so without first reviewing the communications for which the privilege is sought.  This attorney has a duty to prevent a client from offering false evidence.  See Rule 3.3 of the Rules of Professional Conduct. This means, for example, that in an environmental coverage case counsel for the insured cannot permit a representative of the insured to testify that the insured first learned that certain underground water was polluted in January 1993 if this testimony is inconsistent with a communication between the insured and its counsel in 1991 which referred to a pollution problem involving this same underground water.

*Mueller v. Nationwide Mut. Ins. Co.,* 1996 WL 910155 *10, 31 Pa. D & C 4th 23, 39-40 (Pa. Com. Pl. 1996).  *See also*, e.g., *Montgomery v. Etreppid Techs., LLC*, 2009 WL 435195 (D.Nev. 2009) (discussing counsel's obligation under Rule 3.3 and stating that lawyer must not allow the tribunal to be misled by evidence the lawyer knows to be false.)

During the trial the Court also became aware of some apparently routine practices at GMM that raise issues that cannot be ignored.  McKeever testified to a procedure at his firm

whereby foreclosure complaints are prepared and filed by non-attorneys and never reviewed by an attorney, even though the "signature" of an attorney appears on the document. 12/8 Tr. at 83-84. This would seem to be a violation of the *Pennsylvania Rules of Civil Procedure*, which provide that the signature of an attorney on a document filed with a Pennsylvania court is a certification that the document has been read by the attorney. *See Pa.R.Civ.P. 1023.1(c)*. Even though these foreclosure actions are not being filed in this Court and thus do not expose GMM to sanctions, concern for our sister courts in this Commonwealth compel the Court to at least make publicly known what it learned during the trial. Furthermore, often these fundamentally flawed foreclosure actions, form the basis for related relief in this Court should the state court defendant subsequently file a bankruptcy petition. Therefore, the Court is concerned about the continuation of this practice by GMM.

More germane to matters directly affecting this Court was testimony that Puida permitted an attorney named Ann Swartz to "sign" a document on behalf of Puida even though she (Puida) had not reviewed the document in question, and even though Swartz is not a member of the Bar of this Court and was not admitted *pro hac vice* in this matter. The Court believes this sort of conduct to be deceptive and a violation of the spirit, if not the letter, of *Fed.R.Bankr.P. 9010(a)* and *(b)*, *9011(a)*, and, *Local Rule 9010-1*. Due to the other more serious matters addressed herein, and Puida's testimony that this practice is no longer being followed, the Court will not impose separate sanctions for this conduct. Counsel are on notice, however, that sanctions may be appropriate in the future should the Court become aware of any further instances of this type of conduct.

## CONCLUSION

For the reasons given, the Court finds that no sanctions will be imposed against Countrywide pursuant to the *Rule* except with respect to Item 4 of the *Rule* concerning the false representation made in the *Motion to Quash*. Countrywide clearly acted improperly in many respects in connection with its post-discharge pursuit of the Debtor, all as detailed above. However, the Court finds that the combination of the very favorable settlement which has made the Debtor whole, the negative publicity already experienced by Countrywide over this matter and the absence of any evidence to show a systemic problem existing at Countrywide respecting the points raised in the *Rule*,[34] are sufficient reasons not to impose any additional sanction at this time.

As to Puida and GMM, the Court finds that no sanctions will be imposed with respect to Item 5 of the *Rule* directed to them but that consideration of sanctions is appropriate as to Items 6 and 7.

During Trial, the Court advised the Parties that if it found sanctionable conduct to exist it would bifurcate the matter and hold a separate hearing to consider the type and extent of sanction that should be imposed. In keeping with that approach, the Court will schedule such a hearing as to GMM and Puida.

Finally, with respect to the "other instances" of misconduct that came to light during the trial, an *Order and Rule to Show Cause* will be issued against Atty. Charles Townsend directing

---

[34] Although there was a lack of evidence in this case as to any systemic problems at Countrywide, that is not tantamount to a finding that there are no such systemic problems. As indicated throughout this *Opinion*, the focus in this case has been on the specific facts attending the Hill case. The recent "global" settlement between Countrywide and the FTC might well be indicative of the existence of systemic issues.

him to personally appear and show cause as to why he should not be appropriately sanctioned for providing what appears to be false, or at the least misleading, testimony while under oath. Depending on the outcome of that hearing, the Court will determine whether any other counsel involved in this matter should be required to explain their failure to take appropriate, remedial action to prevent the Court from being misled by such false or misleading testimony.

Before concluding, a few observations about lessons to be learned from this case are appropriate. The real estate "meltdown" of the past several years has brought the whole subject of mortgages and foreclosures to the forefront of public awareness. In the Court's own experience, the prospect of dealing with a mortgage lender or mortgage servicer over a delinquency, or anything else other than the ordinary payment plan, clearly inspires feelings of dread, mystery and frustration in the average borrower. If the present case is at all representative, those feelings are substantially justified.

Here, the Debtor did everything right. Despite that, she was put through a grinding process by Countrywide even though along the way it repeatedly failed to take appropriate action to reconcile the Debtor's account. This was not a case where a single error led to a bad result. There were multiple points in the process – both during and after the bankruptcy concluded – when Countrywide and its agents missed successive opportunities for prevention or correction, which include:

- failing to properly account for payment to the prior servicer,
- failing to properly account for loan payments received by it,
- failing to timely conduct audit and escrow analyses required by RESPA and its own internal policies,

74

- failing to send appropriate and timely notices of payment change,
- failing to abide by bankruptcy court orders and rules,
- failing to properly respond to inquiries of the Debtor and her attorney,

- failing to respond to inquiries by the Pennsylvania Attorney General,
- failing to timely advise of false notices of payment change
- failing recognize the effect of the bankruptcy discharge order when filing a foreclosure action,
- failing to abide by admonitions of the bankruptcy judge regarding applicable law by continuing settlement negotiations based upon letters it knew appeared authentic but in reality were not.

Throughout this matter, Sharon Hill did everything she was supposed to do. She dutifully met her obligations under the Chapter 13 Plan during its five year duration. Upon receiving her discharge, she immediately assumed responsibility for her post-bankruptcy obligations and resumed – or at least attempted to resume – making her mortgage payments. When that failed, she tried to work things out with Countrywide but her entreaties were repeatedly ignored. She was "pushed back" at every opportunity for Countrywide to do the right thing and correct the wrong being done to her. Yet, Countrywide didn't discriminate, maintaining its cavalier approach throughout. It remained consistent in it's *modus operandi*. Not only did it ignore the Debtor's inquiries, but it ignored the inquiries from the PA Attorney General and warnings from the Debtor's personal attorney, as well.

But for Atty. Julie Steidl noticing the address change while preparing for work that morning on December 20, 2007, quite possibly she, the Debtor, and this Court, may never have

known about the "after the fact" creation of the payment change letters or any of the other insensitive and inexcusable conduct Countrywide displayed in handling this account, from start to finish.

Most likely Countrywide would have continued to exercise its might and demand "tribute" to settle the case, despite prior admonitions from the bankruptcy court that it had no basis for its position, in amounts with no real relationship to what was owed – in this case – nothing. At some point the Debtor would have had to seriously consider, and most likely accept because of the mounting expenses her fight against Goliath was causing her to incur, capitulation. Soon, a practical, business decision most likely would require her to forego "principle" and settle the matter in an amount she could afford so as to make the obligation current, post bankruptcy, and make the problem go away. Fortunately for her, that bridge never had to be crossed. But how many other, similarly situated debtors will be so fortunate?

Although originally alleged, the Court was not presented with any evidence to support a finding for the existence of a systemic problem with loan servicing at Countrywide. Perhaps, this case was just an inexplicable aberration – where what could go wrong, did go wrong – although the Court highly doubts it. If only Countrywide, in particular, and the mortgage lender/servicer industry, in general, would take to heart just how devastating these kinds of mistakes can be to borrowers who are trying to do the right thing and honor their obligations. If such were to occur, and the lessons learned from this case lead to a correction in the way in which lenders and

servicers currently do business when dealing with borrowers, then maybe everything Sharon Hill

had to endure will not have been in vain and some good will come from it.

Dated: October 5, 2010        Thomas P. Agresti, Chief Judge
                   United States Bankruptcy Court

Case Administrator to serve:
       Norma Hildenbrand, Esq.
       Patrick S. Layng, Esq.
       Lisa D. Tingue, Esq.
       Dorothy A. Davis, Esq.
       Thomas A. Connop, Esq.
       Bradley C. Knapp, Esq.
       Francis X. Manning, Esq.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In Re:

| | | |
|---|---|---|
| SHARON DIANE HILL, | : | Case Number 01-22574 JAD |
| Debtor, | : | Chapter 13 |
| | | |
| ROBERTA A. DeANGELIS, | : | Related to Doc. No. 435 |
| Acting United States Trustee | : | |
| for Region 3, | : | |
| Movant, | : | |
| | : | |
| v. | : | |
| | : | |
| COUNTRYWIDE HOME LOANS, | : | |
| INC., GOLDBECK, McCAFFERTY | : | Hearing: November 22, 2010 at 2:00 P.M. |
| AND McKEEVER, and | : | |
| ATTORNEY LESLIE PUIDA, | : | |
| Respondents. | : | |

## ORDER AND RULE TO SHOW CAUSE

**AND NOW**, this **5th** day of **October, 2010**, for the reasons set forth in the accompanying *Memorandum Opinion*, it is **ORDERED, ADJUDGED and DECREED** that,

(1)     Items 1, 2 and 3 of the **Rule to Show Cause** ("Rule"), Document No. 435, as directed against Countrywide Home Loans, Inc ("Countrywide"), and Item 5 of the *Rule*, as directed against Goldbeck, McCafferty and McKeever ("GMM") and Attorney Leslie Puida ("Puida") are **VACATED**.

(2)     With respect to Item 4 of the *Rule*, as directed against Countrywide, the Court finds sufficient cause exists to sanction Countrywide pursuant to *Fed.R.Bankr.P. 9011*, and that a sufficient sanction so as to deter repetition of such conduct in the future or comparable conduct by others similarly situated, is a "public censure" of Countrywide and a reminder of its obligations under *Fed.R.Bankr.P. 9011(b)(3)* to make reasonable investigation before making factual allegations in documents filed with the Bankruptcy Court, or any other court for that matter. The Court's comments in the *Memorandum Opinion* and in this *Order* constitute that censure and reminder. Therefore, no further hearing or action is required in regard to Paragraph (4) of the *Rule*.

(3)     With respect to Items 6 and 7 of the *Rule* as directed against GMM and Puida, the Court finds that sufficient cause exists to impose sanctions pursuant to the Court's inherent power its power pursuant to *11 U.S.C. §105(a)* and *Fed.R.Bankr.P. 7037*, incorporating *Fed.R.Civ.P. 37(c)(1)(C)*. Therefore, a hearing is scheduled for ***November 22, 2010 at 2:00 P.M.***, in the Erie Bankruptcy Courtroom, U.S. Courthouse, 17 South Park Row, Erie, PA, for the purpose of considering and determining appropriate sanctions, at which time ***Leslie M. Puida*** and ***Michael T. McKeever***, in his capacity as a representative of GMM, with authority to speak for the firm, are directed to ***personally*** appear.

(4)     With respect to the apparent misconduct of ***Attorney Charles Townsend*** ("Townsend") as described in the *Memorandum Opinion*, a *Rule to Show Cause* is hereby issued directing him to ***personally*** appear on the ***November 22, 2010 at 2:00 P.M.***, in the Erie Bankruptcy Courtroom, U.S. Courthouse, 17 South Park Row, Erie, PA, to show cause why sanctions should not be imposed against him for providing false or misleading testimony under oath during his deposition in this matter, which testimony was then used at the time of trial due to Townsend's

2

unavailability. The Court further understands that Townsend may no longer be affiliated with Countrywide. If that is correct, Countrywide and its Counsel of Record, Thomas P Connop, are directed to effect personal service of a copy of this *Order* and *Rule to Show Cause*, together with the *Memorandum Opinion*, on Townsend immediately after receipt of this *Order* and file a ***Certificate of Service*** to that effect **on or before October 12, 2010.**

_____
Thomas P. Agresti, Chief Judge
United States Bankruptcy Court

Case Administrator to serve:
      Patrick S. Layng, Esq.
      Lisa D. Tingue, Esq.
      Norma Hildenbrand, Esq.
      Thomas A. Connop, Esq.
      Dorothy A. Davis, Esq.
      Bradley C. Knapp, Esq.
      Francis X. Manning, Esq.
      Charles Townsend, Esq.