IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| SHARON DIANE HILL | ) | Case Number 01-22574 JAD |
| Debtor, | ) | Chapter 13 |
| | ) | |
| ROBERTA A. DeANGELIS, | ) | Related to Doc. No. 560 and 570 |
| Acting United States Trustee | ) | |
| For Region 3, | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTRYWIDE HOME LOANS, | ) | |
| INC., GOLDBECK, McCAFFERTY | ) | |
| AND McKEEVER, and | ) | |
| ATTORNEY LESLIE PUIDA | ) | |
| Respondents | ) | |

## PROFFER OF ANTICIPATED TESTIMONY OF C. CHARLES TOWNSEND

AND NOW, comes C. Charles Townsend, by and through his attorneys, Pietragallo Gordon Alfano Bosick & Raspanti, LLP, who hereby submits the following Proffer of Anticipated Testimony.

## I.    INTRODUCTION

C. Charles Townsend is a lawyer who is now engaged in private practice in Dallas, Texas.    He is the former Senior Vice President and Assistant General Counsel of Countrywide.    Mr. Townsend welcomes the opportunity to present himself to this Honorable Court and provide facts in response to the October 5, 2010 Order and Rule to Show Cause, wherein this Court directed Mr. Townsend "to show cause why sanctions should not be imposed against him for providing false or misleading testimony under

1

EXHIBIT 1

oath during his deposition in this matter . . . ." *In re Hill*, 437 B.R. 503, 549 (Bankr. W.D. Pa. 2010).

This Court has authorized counsel for Mr. Townsend to present a Proffer of Anticipated Testimony from Mr. Townsend. As Mr. Townsend has not personally appeared on behalf of Countrywide or offered live testimony to this Court, this Proffer is intended to provide the Court with a written preview prepared by counsel of the anticipated testimony that Mr. Townsend will offer, in person, on November 22, 2010.

## II.  PROFFER OF ANTICIPATED TESTIMONY

Mr. Townsend will provide the Court with information regarding his educational and employment history. He will also testify concerning the corporate hierarchy within the Bankruptcy and Real Estate Management Division and the Litigation Department at Countrywide, and their respective roles and responsibilities with respect to litigation. Mr. Townsend will also discuss his personal responsibilities during his employment at Countrywide, and how those responsibilities developed during his tenure, all of this setting the "context" of his role in this matter.

Mr. Townsend will discuss his involvement in the Sharon Hill case (*Hill* case), including how he first came to learn of the matter in late October of 2007 after the United States Trustee (UST) filed Notices of Rule 2004 Examinations in ten (10) Countrywide cases. Mr. Townsend will also answer any questions that this Court may have regarding perceived inconsistencies between his deposition testimony and certain e-mails that were disclosed during trial.

A.  Educational and Employment History

Mr. Townsend graduated from the University of Texas in 1996. In 2000, he earned his J.D. from Southern Methodist University (SMU). Thereafter, he passed the Texas bar examination and began working for a small medical-malpractice defense firm located in Dallas, Texas.

In 2004, Mr. Townsend accepted the position of Assistant General Counsel in Countrywide's Litigation Department, working from its Plano, Texas office.

B.  Corporate Hierarchy

Within Countrywide, there existed various Business Units, such as the Bankruptcy and Real Estate Management Division. Separate and apart from these Business Units was the Legal Division, and within that, the Litigation Department. In an effort to explain his role and responsibility within Countrywide, Mr. Townsend will discuss the Corporate Hierarchy and chain of command of the Bankruptcy and Real Estate Management Division and the Litigation Department at Countrywide.

Mr. Townsend will explain that the Bankruptcy and Real Estate Management Division and the Litigation Department within Countrywide were separate departments with distinct, yet sometimes overlapping, roles and responsibilities. Primary responsibility for routine, as well as most contested bankruptcy actions, such as Sharon Hill's, was held by the Bankruptcy and Real Estate Management Division.[1] This primary responsibility includes the authority to authorize a settlement. As a general rule, the Litigation Department did not become involved in a bankruptcy matter unless something

---

[1] With respect to the people involved in the *Hill* matter, the ascending chain of command within the Bankruptcy and Real Estate Management Division was as follows: Kimberly Hill → Bobbi Hook → Lisa Middleton → John Smith → Mark Acosta → Rick Hildebrand → Steve Bailey → Jack Schakett → Dave Sambol → Angelo Mozilo.

occurred that would escalate the action to its attention, e.g. an adversary proceeding. Even in matters in which it was involved, the Litigation Department in general and Mr. Townsend in particular did not have the authority to settle a matter or to direct outside counsel to settle a matter.

C.     <u>Professional Responsibilities</u>

In his position as Assistant General Counsel, Mr. Townsend worked within Countrywide's Litigation Department. His primary responsibility was to serve as a liaison for outside counsel with the Business Units of Countrywide implicated in the litigation. These cases were assigned to him by his direct supervisor, Executive Vice President and Deputy General Counsel, Wendy Scholl.

Mr. Townsend was involved with class action complaints; lawsuits filed by investors against the company related to servicing; disputes regarding loan origination and fraud at the origination; and beginning in the summer of 2007, the bankruptcy litigation initiated by the UST. Mr. Townsend never had direct responsibility for individual debtor/bankruptcy matters and never directly represented Countrywide in actual litigation. During his time at Countrywide, Mr. Townsend never entered his appearance in any cases, nor did he examine a witness in court or in a deposition or file papers with the court(s).

With respect to the litigation managed by Mr. Townsend, his primary responsibility was to liaise between outside counsel, the appropriate Business Unit within Countrywide, and any others within the enterprise who possessed information material to the case until the matter was resolved. To accomplish this goal, Mr. Townsend would review the facts of a new matter and engage appropriate outside counsel. He would often

prepare a summary of the case and provide this information to the appropriate Business Unit. As the matter progressed, Mr. Townsend would review pleadings, motions, and discovery responses prior to submitting them to the Business Unit for verification.

Although he had the authority to approve the legal bills of outside counsel, amounts totaling tens of thousands of dollars, Mr. Townsend, as part of the Litigation Department, did not have the authority to settle a case at any price. Only those individuals within the Business Unit had settlement authority.

At the time of his hiring, Mr. Townsend was initially responsible for managing approximately 35 cases. However, at the time of the litigation with the Chapter 13 Trustee and UST in 2007–2008, Mr. Townsend was responsible for more than 100 additional cases, and before returning to private practice in 2009, Mr. Townsend was involved with approximately 120 cases.

D.    UST, Chapter 13 Trustee, and Sharon Hill Litigation

With the backdrop of the testimony outlined above, Mr. Townsend will discuss his involvement in the UST and Chapter 13 Litigation and the *Hill* case. For purposes of clarity, the term "*Hill* case" refers to the underlying bankruptcy and foreclosure actions involving Sharon Hill, and does not, on its own, encompass the 293 Motions to Compel filed by the Chapter 13 Trustee or the *Notices of 2004 Examinations* filed by the UST.

Mr. Townsend learned that the UST was planning to take action against Countrywide shortly before it occurred. In early October of 2007, Mr. Townsend attended a deposition in California of a Countrywide employee in separate litigation with the UST. During this deposition, Steve Katzman of the UST's office informed Mr. Townsend that the UST would be expanding its investigation into Countrywide's

bankruptcy servicing, that the investigation would expand into other states, including Florida and Pennsylvania, and that something would be coming down the pipeline.

On October 10, 2007, the Chapter 13 Trustee filed 293 Motions to Compel against Countrywide in various actions, including the *Hill* case. Each of these 293 Motions to Compel sought sanctions against Countrywide.

On October 18, 2007, the UST filed *Notices of Rule 2004 Examinations* in ten (10) cases involving Countrywide, including the *Hill* case. Shortly thereafter, Mr. Townsend learned of these filings from Michael McKeever of Goldbeck McCafferty & McKeever.

After discussing the matter with his superior, Wendy Scholl, she assigned to him responsibility for managing the litigation emanating from the UST *Notices of Rule 2004 Examinations* and the 293 Motions to Compel filed by the Chapter 13 Trustee. Mr. Townsend then engaged outside counsel.

With respect to the UST *Notices of Rule 2004 Examinations*, the first response was to challenge the jurisdiction of the UST. Countrywide argued that the UST lacked standing to pursue the *Notices of Rule 2004 Examinations* in matters that were closed. Of the ten (10) *Notices of Rule 2004 Examinations* that were filed, nine (9) of the cases were closed. The only one open at the time was the *Hill* case.

Because of its impact on Countrywide's jurisdictional defense in the UST litigation, Mr. Townsend familiarized himself with the factual and procedural history of the *Hill* case. Additionally, he intended to stay apprised of any developments. Based on his communications with individuals involved in the *Hill* case, it was Mr. Townsend's understanding during October of 2007 that the underlying issue involved the failure to

adjust the debtor's payment plan, and that the debtor and Countrywide were working towards a final resolution.

While he believed settlement of the *Hill* case would help the jurisdictional defense in the UST litigation, Mr. Townsend did not have the authority to authorize a settlement. As in any other litigated matter, settlement authority had to come from a Business Unit. Additionally, Mr. Townsend could not offer parameters or terms that would be acceptable to Countrywide in the *Hill* case. Again, this information could only be given by the Business Unit, and in fact, was provided by the Business Unit.

This Honorable Court held a status conference in the *Hill* case on December 20, 2007. Mr. Townsend attended this status conference because of the impact that the *Hill* case had on the jurisdictional defense in the UST litigation.

Prior to the status conference, Mr. Townsend met with John Smith, Tom Connop, Dorothy Davis and Leslie Puida at the offices of Eckert Seamans in Pittsburgh.[2] During this meeting, as this Court has found, Mr. Townsend first learned that the Payment Change Letters in the *Hill* case had not been sent to the debtor, her counsel, or the Chapter 13 Trustee. While Mr. Townsend was surprised to learn this fact, he was told that Ms. Hill's counsel had been informed of this fact and that it was not an issue.

E.      Perceived Inconsistencies Between Deposition Testimony and E-mails.

Mr. Townsend will also speak to the perceived inconsistencies between his deposition testimony and the e-mails that came into evidence towards the end of trial on the Rule to Show Cause. While Mr. Townsend does not believe that there are any inconsistencies, the Opinion and Order offers insight into what the Court may perceive to be inconsistencies, and Mr. Townsend appreciates the opportunity to set the record

---

[2] Mr. Townsend believes that Mr. McKeever was also present at this meeting, but cannot recall.

straight with this Court. In addition to answering any and all questions that the Court may have, Mr. Townsend will explain the content of the e-mails and how they comport with his deposition testimony.

As the Court will recall, the taking of Mr. Townsend's deposition was a point of contention between Countrywide and UST. In his position as Assistant General Counsel, most all of the information that Mr. Townsend knew or possessed was privileged.

During his deposition as a fact witness,[3] Mr. Townsend answered the questions that were asked of him. He will tell the Court that he did not anticipate that this would be his trial testimony. Mr. Townsend, at the time of his deposition, was still in-house counsel and fully expected to attend the trial in person. While Mr. Townsend did not have the opportunity to appear personally at the initial trial, he will do so now.

After hearing the designated portion of Mr. Townsend's deposition read into the record, this Court "was thus left with the clear impression that Townsend was not involved in any way with the Hill case and the focused efforts to get it settled." *In re Hill*, 437 B.R. at 543. The Court stated that the e-mails later offered into evidence "paint a far different picture of Townsend's involvement in Hill than did his testimony." *Id.* Mr. Townsend's testimony will demonstrate that these e-mails are entirely consistent with his deposition.

With respect to the *Hill* case, Mr. Townsend testified[4] that he did not supervise or have any role in the motion to enforce discharge litigation, which he considered to be separate and apart from the litigation brought by the UST through the *Notices of Rule*

---

[3] Mr. Townsend spent approximately four (4) to five (5) hours preparing for his deposition; meeting with outside counsel, skimming deposition transcripts, and reviewing documents that had been designated as UST exhibits. The deposition lasted for over three hours, including breaks.

[4] Portions of Mr. Townsend's deposition cited herein are attached hereto as Exhibit A.

*2004 Examinations.* (Ex. A, 37:3–38:3). Yet, when asked whether he had "any involvement whatsoever in any way with Sharon Hill's bankruptcy case," a question in which Mr. Layng was "trying to be as broad as possible," Mr. Townsend responded "Yes. I was involved with Sharon Hill's case beginning when the U.S. Trustee sent out its notice of 2004 Examination." (Ex. A 52:24–53:13).

As recognized by this Court, the filing of the 293 Motions to Compel by the Chapter 13 Trustee, and the *Notices of 2004 Examinations* from the UST, elevated a single case with modest attention (*i.e.* the *Hill* case) to the attention of high-ranking individuals at the company. *In re Hill*, 437 B.R. at 516. Mr. Townsend, as Countrywide's in-house litigation attorney managing the Chapter 13 litigation and UST litigation, was interested in the developments of the *Hill* case, as it directly impacted Countrywide's defense in those actions.

After being assigned responsibility for the UST litigation (or "context cases"), Mr. Townsend took steps to familiarize himself with those underlying cases. With respect to the Hill case, Mr. Townsend had communications with Mr. Smith and received communications from Ms. Puida. (Ex. A, 62:16-63:18). Mr. Townsend made specific requests to Mr. Smith for information that was needed. (Ex. A, 65:15-20). Prior to November 9, Mr. Townsend "received emails from [Ms. Puida]" and "may have even, in fact, replied to some of those emails." (Ex. A, 79:1-7). The subject matter of his communications with Ms. Puida was "to the extent of whether a settlement had been reached" in the *Hill* case. (Ex. A, 79:4-14).

When asked about whether there was a time that he felt comfortable that he knew the basics of what was going on in the *Hill* case, Mr. Townsend testified that "[a]gain, if

you consider the basics to being Ms. Hill filed a bankruptcy and the United States Trustee issued a 2004 Examination within that bankruptcy, then approximately October 20th. But the ins and outs of the case, the accounting involved, the allegations, the motion to enforce discharge, all of those things were after that point." (Ex. A, 66:7-12).

With respect to the status of the *Hill* case, Mr. Townsend "wanted to be kept in the loop, so to speak, of what was going on in the Hill case." (Ex. A, 70:4-5). He was not, however, involved in the negotiations or setting parameters for settlement. (Ex. A, 73:25-74:8). Mr. Townsend never provided settlement parameters. (Ex. A, 82:13-19). This is because Mr. Townsend, as well as the Litigation Department, did not have settlement authority; that authority could only come from the appropriate Business Unit. (*See, e.g.*, Ex. A 40:6-15, 44:10-14, 81:18-20). Thus, Mr. Townsend did not have to approve or be informed of the settlement in the *Hill* case, nor did Locke Lord. (Ex. A, 88:14-25).

The e-mails referenced by this Court are entirely consistent with the testimony from Mr. Townsend. Court Exhibit 2 is an October 26, 2007 e-mail from Leslie Puida to Mr. Townsend, with copies sent to Gary McCafferty, John Smith, and Michael McKeever. (*See* 12/09/09 Trial Tr. Court Ex. 2). In the e-mail, Ms. Puida writes:

> It is not in the debtor's interests to allow the hearing to go forward since the docs indicate that the debtor, counsel and trustee all received notice of the payment increase, yet the plan was not amended to reflect the increase. The best way to guarantee that the hearing is not held is to settle it before Wednesday.

(*Id.*). Here, Mr. Townsend is being "kept in the loop" on the status of the *Hill* case.

In Court Exhibit 3, Ms. Puida, on October 26, 2007, acknowledges receipt of settlement parameters from Bobbi Hook. (*See* 12/09/09 Trial Tr. Court Ex. 3). This e-

mail is consistent with Mr. Townsend's testimony that settlement authority lay with the Business Units, and here, specifically in the Bankruptcy and Real Estate Management Division.

Court Exhibit 5 is another e-mail from Leslie Puida, dated December 18, 2007, addressed to herself, Bobbi Hook, and Michael McKeever, with copies sent to Charles Townsend, Gary McCafferty, John Smith and Lisa Middleton. (*See* 12/09/09 Trial Tr. Court Ex. 5). In this e-mail, Ms. Puida provides an update of the settlement discussion in the *Hill* case. (*Id.*) The fact that Mr. Townsend received this e-mail is again consistent with his testimony that he wanted to be "kept in the loop" of the developments in the *Hill* case. (Ex. A, 70:4.) All of this done for the purpose of liasing information to outside counsel in the UST cases.

Court Exhibit 6 contains a chain of e-mails to and from Mr. Townsend dated October 25, 2007. (*See* 12/09/09 Trial Tr. Court Ex. 6). As this Court observed, Mr. Townsend had asked Mr. McKeever to see whether he could get the October 31st hearing continued and, if so, during that interim, "we" could "try to do a workout." (*Id.*) This, too, comports with Mr. Townsend's testimony.

Mr. Townsend, through his being kept in the loop, understood that Countrywide and Sharon Hill, through her attorney, were negotiating a settlement and that postponing the hearing would provide more time for them reach an agreement. Further, Mr. Townsend testified that on October 26th he "was more concerned with the [UST's] standing" than anything else. (Ex. A 70:18–20). He was concerned about the UST's standing, again, because he had been assigned the UST matter and because he was responsible for resolving the UST matter. Mr. Townsend believed that a workout in the

*Hill* case would strengthen Countrywide's defense to the *Notices of Rule 2004 Examinations* from the UST. By reference to "we," he did not mean he and McKeever or he and anyone else. He meant Countrywide; without question, he himself did not have the authority to "work out" anything with Ms. Hill.

If the hearing were not continued, Mr. Townsend notes that "we need to formulate [a] strategy for the hearing." (*See* 12/09/09 Trial Tr. Court Ex. 6). Again, Townsend was interested in the developments of the *Hill* case because of its impact on the UST Litigation.

As the Court also noted, Mr. McKeever responds that "We won't settle any of it without your input." (*See id.*). This statement from Mr. McKeever is not responsive to Mr. Townsend's request, and Mr. Townsend does not know why Mr. McKeever wrote those words.

The second e-mail of Court Exhibit 6 authored by Mr. Townsend provides further clarification of his initial e-mail. (*See* 12/09/09 Trial Tr. Court Ex. 6 *and* 12/09/09 Trial Tr. Court Ex. 2). Here, Mr. Townsend writes "[p]lease understand the UST issue, of which this case is now a part, is very significant to the company and is being reported to the highest levels." (*See* 12/09/09 Trial Tr. Court Ex. 6.). While Mr. Townsend was not involved in determining the settlement parameters in the *Hill* case, or in the actual negotiations with debtor's counsel, Mr. Townsend was interested in the resolution of the *Hill* case because of its impact on the UST litigation.

Court Exhibit 7 further supports Mr. Townsend's testimony that he did not have authority to settle the *Hill* case. (*See* 12/09/09 Trial Tr. Court Ex. 6.). In response to a request from Ms. Puida for general parameters of settlement conditions that would be

acceptable to Countrywide, which was sent to Mr. Townsend, Mr. McKeever, Mr. McCafferty and Mr. Smith, Mr. Townsend writes that "John Smith will respond shortly." (*See id.*). John Smith, of the Bankruptcy and Real Estate Management Division, could provide settlement parameters, while Mr. Townsend could not. (Ex. A, 103:2-5).

With respect to Court Exhibit 8, Mr. Townsend's e-mail requesting information on "any updates" coincides with his testimony that he wanted to be "kept in the loop" in the Hill case, and that he may have sent e-mails to Ms. Puida concerning the *Hill* case. (*See* 12/09/09 Trial Tr. Court Ex. 8).

Regarding the review of the stipulation between Countrywide and Sharon Hill, Mr. Townsend did not, in his position as Assistant General Counsel supervising the UST litigation, *have* to approve the settlement of the *Hill* case. The same is true for Locke Lord, in their position as outside counsel in the UST litigation. If he had been asked during his deposition "did you want to be informed of the settlement of the *Hill* case, Mr. Townsend would have answered "yes." If asked during his deposition whether he or Locke Lord *wanted* to review the stipulation between Countrywide and Sharon Hill, a question asked by Mr. McKeever in Court Exhibit 8, Mr. Townsend would have answered, as he did, "Both of us." (*See* 12/09/09 Trial Tr. Court Ex. 8). If Mr. Townsend and/or Locke Lord *needed* to review the stipulation, Mr. McKeever would have provided it directly to them, without asking whether Mr. Townsend or Locke Lord *wanted* to review the stipulation.

Respectfully submitted,

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

/s/ William Pietragallo, II
William Pietragallo, II, Esquire
PA I.D. #16413
wp@pietragallo.com
Richard J. Parks, Esquire
PA I.D. #40477
rjp@pietragallo.com

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP.

One Oxford Centre
38TH Floor
Pittsburgh, PA  15219
(412) 263-2000

*Attorneys for C. Charles Townsend*

1  IN THE UNITED STATES BANKRUPTCY COURT
2       WESTERN DISTRICT OF PENNSYLVANIA

3  IN RE:                    )   Bankruptcy Case
                             )   No: 01-22574 JAD
4                            )
   SHARON DIANE HILL,        )
5                            )
        Debtor               )   Chapter 13
6  _____

7  ROBERTA A. DeANGELIS,     )   Relating to Doc. Nos.  223,
   Acting United States      )   226, 236
8  Trustee For Region 3      )
          Movant,            )
9  V.                        )
                             )
10 COUNTRYWIDE HOME LOANS,)      Hearing:  August 11, 2008
   INC., GOLDBECK,           )   at 10:00 a.m.
11 McCAFERTY and McKEEVER )
   and Attorney LESLIE     )
12 PUIDA                     )
        Respondents.         )     **ORIGINAL**
13

14        *  *  *  *  *  *  *  *  *  *  *  *  *

15        ORAL DEPOSITION OF CHARLES TOWNSEND

16        *  *  *  *  *  *  *  *  *  *  *  *  *

17        ORAL DEPOSITION OF CHARLES TOWNSEND, being produced as a

18  witness at the instance of the Plaintiff, taken in the

19  above-styled and numbered cause on the 24th day of February,

20  2009, before Cindy Sumner, Certified Shorthand Reporter in

21  and for the State of Texas, by machine shorthand, at the

22  offices of Locke Lord Bissell & Liddell, located at 2200 Ross

23  Avenue, Suite 2200, Dallas, Texas, in accordance with the

24  Federal Rules of Civil Procedure and the agreements

25  hereinafter set forth:

1        IN THE UNITED STATES BANKRUPTCY COURT
            WESTERN DISTRICT OF PENNSYLVANIA
2

3    IN RE:                  )   Bankruptcy Case
                             )   No: 01-22574 JAD
4                            )
     SHARON DIANE HILL,      )
5                            )
            Debtor           )   Chapter 13
6    _____

7    ROBERTA A. DeANGELIS,   )   Relating to Doc. Nos.  223,
     Acting United States    )   226, 236
8    Trustee For Region 3    )
            Movant,          )
9    V.                      )
                             )
10   COUNTRYWIDE HOME LOANS, )   Hearing:  August 11, 2008
     INC., GOLDBECK,         )   at 10:00 a.m.
11   McCAFERTY and McKEEVER  )
     and Attorney LESLIE     )
12   PUIDA                   )
            Respondents.
13

14

15        *   *   *   *   *   *   *   *   *   *   *   *

16        ORAL DEPOSITION OF CHARLES TOWNSEND

17        *   *   *   *   *   *   *   *   *   *   *   *

18

19

20

21

22

23

24

25                 FEBRUARY 24, 2009

1              A P P E A R A N C E S.

2    APPEARING FOR THE UNITED STATES TRUSTEE:

3    Mr. Patrick Layng
     United States Department of Justice
4    Office of the United States Trustee
     219 South Dearborn Street, Suite 873
5    Chicago, Illinois  60604

6    AND

7    Ms. Norma Hildenbrand
     United States Department of Justice
8    Office of the United States Trustee
     1001 Liberty Avenue, Suite 970
9    Pittsburgh, Pennsylvania  15222

10   AND

11   Ms. Lisa Tingue
     United States Department of Justice
12   Office of the United States Trustee
     446 Main Street, 14th Floor
13   Worcester, Massachusetts  01609

14
     APPEARING FOR RESPONDENT COUNTRYWIDE HOME LOANS, INC.
15
     Mr. Thomas Connop
16   Locke, Lord, Bissell & Liddell
     2200 Ross Avenue, Suite 2200
17   Dallas, Texas  75201

18   AND

19   Ms. Dorothy Davis
     Eckert, Seamans, Cherin & Mellott
20   600 Grant Street, 44th Street
     Pittsburg, Pennsylvania  15219
21
     AND
22
     Mr. Andrew Hruska
23   King & Spalding
     1185 Avenue of the Americas
24   New York, New York  10036

25

1  APPEARING FOR THE RESPONDENTS GOLDBECK, McCAFERTY &
   McKEEVER,  and ATTORNEY LESLIE PUIDA:
2
   Mr. Francis X. Manning
3  Stradley Ronon Stevens & Young
   200 Lake Drive East, Suite 100
4  Cherry Hill, New Jersey  08002

5  ALSO PRESENT:

6  Mr. Albert Loftus, Senior Paralegal Specialist
   Civil Enforcement Unit
7. United States Department of Justice
   Office of the United States Trustee
8  1100 Commerce Street, Suite 976
   Dallas, Texas  75242
9

10

11

12

13

14

15

16

17 ·

18

19

20

21

22

23

24

25

 1  that were in effect at the time -- time at issue in the

 2  litigation.

 3      Q.   Did you supervise the motion to enforce discharge

 4  litigation in the Sharon Hill case?

 5      A.   No.

 6      Q.   You did not?

 7      A.   I did not.  I don't know who did.

 8      Q.   What was your role in that litigation?

 9      A.   I did not have a role in that litigation.

10      Q.   Whatsoever?

11              MR. CONNOP:  You're speaking now of the

12  defined period from March of '07 --

13              MR. LAYNG:  Right.

14              MR. CONNOP:  -- to December 20th of '07,

15  Mr. Layng?

16              MR. LAYNG:  I'm speaking of that question.

17              MR. CONNOP:  Okay.  Well then you've changed

18  the question.  Go ahead.

19      A.   Okay.  To make sure I understand, you want to know

20  what role, if any, I played in the motion to enforce

21  discharge litigation of the Hill matter --

22      Q.   Correct.                          *apart*

23      A.   Which I consider to be separate and a part from the

24  204 litigation, the litigation brought by the U.S. Trustee

25  through 2004 Examination notices.

1      Q.   Fine.

2      A.   Okay.  Again, my testimony is the same.  I had no

3    role in the motion to enforce discharge litigation.

4      Q.   So I take it that you didn't then read policies

5    that were relevant to that case in the manner we kind of

6    described hypothetically that you would do with cases that

7    you were supervising?

8              MR. CONNOP:   Object to form.

9      A.   The answer to that question is, depends upon the

10   time period and whether we're still in the March to December

11   time frame, or whether we're after the December time frame.

12     Q.   We'll use that time frame of March to December 20.

13     A.   During that time I did not review -- well, I don't

14   know that I can answer this question, Mr. Layng, because it's

15   a hypothetical on whether I did something in connection with

16   a litigated matter that I had no role in.

17     Q.   Well, it's not hypothetical.  It's a direct

18   question about your behavior during that time period.

19     A.   Okay.

20     Q.   Did you review policies having to do with cure

21   orders?

22     A.   And, again, that's not a fair question.  Because

23   whether I may have reviewed policies and procedures that

24   someone down the road might consider could have been related

25   to the Hill motion to enforce discharge, I don't know.  Did I

1      A.    I'm not aware of any.

2      Q.    Are you aware of any policies regarding the

3 settlement of litigation disputes by Countrywide during the

4 time period we mentioned?

5                MR. CONNOP:    Object to form.

6      Q.    Well, let me ask you more specifically.

7       Are you aware of any policies regarding who has

8 authority to settle cases during the time period we've

9 mentioned?

10     A.    I am generally aware that there may be unwritten

11 policies within the business units on settlement authority

12 that those people have.

13     Q.    And who -- but what about the legal department?

14     A.    I can't speak to the legal department.    The

15 litigation department does not have settlement authority.

16                (Page 40 line 16 through 42 line 21 sealed.)

17

18

19

20

21

22

23

24

25

1    the business unit who has the proper authority within that

2    unit.

3         Q.   What level do they have to be in the business unit?

4         A.   That's what I don't know.

5         Q.   Okay.  So is that true for any settlement of any

6    litigation?

7         A.   The answer really is, I don't know.  Because as I

8    stated before, there's litigation that is not managed by the

9    litigation department.

10        Q.   Okay.  In cases that are managed by the litigation

11   department, who has authority to settle?

12        A.   My understanding is nobody in the litigation

13   department has the authority.  It would have to be obtained

14   from the business unit.

15        Q.   And what level in the business unit?  You don't

16   know?

17        A.   Again, I don't know.

18                      (Page 44 line 18 through 46 line 14 sealed.)

19

20

21

22

23

24

25

1          MR. CONNOP:  Object to form.

2     A.   That presumes that such a decision was made by

3  somebody.

4     Q.   Yes, it does.

5     A.   Even with that presumption, if that, in fact,

6  occurred, I don't know who that was or would be.

7     Q.   And you don't even know if there was a conscious

8  decision by anybody?

9     A.   That is correct.

10    Q.   Okay.   And based on your experience at

11  Countrywide, why is it that an order like this can be entered

12  without a conscious decision by anybody?

13         MR. CONNOP:  Object to form.

14    A.   My experience at Countrywide would not provide me

15  with any context to answer that question.

16    Q.   Is there a policy -- I think I maybe asked this

17  already -- regarding responding to -- I did ask you that.

18  We'll move on.

19         MR. LAYNG:  Do you guys mind if we take a

20  short five minute break?

21         MR. CONNOP:  That's fine.  It's 10:44.

22              (Brief recess ensued from 10:44 to 10:59.)

23         MR. CONNOP:  Back on at 10:59.

24    Q.   All right.  Mr. Townsend, did you have any

25  involvement whatsoever in any way with Sharon Hill's

1   bankruptcy case?

2        A.   When you say Sharon Hill's bankruptcy case, I need

3   to be sure I understand what you're talking about.  Because I

4   believe the bankruptcy may have been reopened at some point

5   to deal with the motion to enforce discharge issues.

6        Q.   I guess I'm trying to be as broad as possible.

7        A.   Sure.

8        Q.   I'm trying to be as broad as possible.   In your

9   involvement in any way connected to Sharon Hill.  I'll put it

10  that way to make it broader.

11       A.   Yes.  I was involved with Sharon Hill's case

12  beginning when the U.S. Trustee sent out its notice of 2004

13  Examination.

14       Q.   Okay.  Tell us -- tell me how that involvement

15  began.

16       A.   I -- in early October Mr. Katzman indicated to me

17  that the U.S. Trustee was going to expand its investigation

18  into Countrywide's bankruptcy servicing and that that was

19  going to go into other states, including Florida and

20  Pennsylvania.  And soon thereafter, I believe through maybe

21  Mr. McKeever's office, I received a copy of that notice of

22  2004 Exam for Ms. Hill, as well as nine others in the Western

23  District.

24       Q.   Who is Mr. Katzman?

25       A.   Steve Katzman was with the U.S. Trustee's Office, I

1       Q.    Did you inform or talk to Mr. McKeever or anybody

2   from the Goldbeck firm regarding -- regarding the effect the

3   subpoena would have?

4       A.    Which subpoena and effect on what?

5       Q.    The subpoena in the context cases and what effect

6   it would have on the handling of the cases mentioned in that

7   context case subpoena.

8       A.    At some point I indicated to either --

9                   MR. CONNOP:    I want to caution you not to

10  reveal the substance of your communications with Mr.

11  McKeever.

12      Let's read back the question so that we can get it

13  down.

14                     (The question was read back.)

15      A.    The answer is no.

16      Q.    What steps were taken by you with regard to

17  familiarizing yourself with the Hill case?

18      A.    At what point in time?

19      Q.    Well, maybe I should ask this.   After you were

20  assigned the context case matter, did you take any steps to

21  familiarize yourself with those cases?

22      A.    Yes.

23      Q.    Was one of those cases the Hill case?

24      A.    Yes.

25      Q.    What did you do?

1      A.    I had communications with Mr. Smith and received

2   communications from Ms. Puida.

3      Q.    Okay. Mr. Smith, how many times did you talk to

4   him about the Hill case?

5      A.    How many times have I talked to Mr. Smith about the

6   Hill case?

7      Q.    In the process of familiarizing yourself.

8      A.    I don't recall.

9      Q.    Do you know if they were in person, or on the

10  phone, or email?

11     A.    They would have been all three.

12     Q.    And were they close in time to when you were

13  assigned the case?

14     A.    I don't know what you consider to be close in time.

15     Q.    Well, you can use your judgment on that.

16     A.    It's your question.

17     Q.    Well, within a two week time.

18     A.    No.

19     Q.    No, what, you did not talk to him within two weeks?

20     A.    You said did you have, I think the question was

21  significant communications, or something like that, close in

22  time.

23     Q.    Would you memorialize your contact with Mr. Smith

24  in any way?

25     A.    To the extent you think an email may be a

 1   related to the case or what?

 2                  MR. LAYNG:  Yeah.

 3        Q.   Did you review pleadings related to the Sharon Hill

 4   case?

 5        A.   Between October 18th and what date?

 6        Q.   December 20th.

 7        A.   I don't know.

 8        Q.   And you don't have any notes that would refresh

 9   your memory on that?

10        A.   No.

11        Q.   Do you think the emails might if they have

12   documents attached to them?

13        A.   There's a chance that an email with an attachment

14   could refresh my recollection.

15        Q.   Did you make specific requests to Mr. Smith on

16   information you wanted?

17        A.   With respect to the Hill case?

18        Q.   Yes.

19        A.   Yes.  I made a request to him for information that

20   I wanted.

21        Q.   What was that information?

22                  MR. CONNOP:  Mr. Townsend, I believe that that

23   intrudes upon the attorney work product privilege.  And I'm

24   going to instruct you not to answer.

25        Q.   Mr. Townsend, did you -- when would you say you had

CHARLES TOWNSEND                                    66

1   a working knowledge of the Hill case?

2                  MR. CONNOP:  Object to form.

3       A.   I'm not sure what you mean by working knowledge.

4       Q.   Where you felt comfortable that you knew the basics

5   of what was going on in that case.

6                  MR. CONNOP:  Object to form.

7       A.   Again, if you consider the basics to being Ms. Hill

8   filed a bankruptcy and the United States Trustee issued a

9   2004 Examination within that bankruptcy, then approximately
                                   in's
10  October 20th.  But the ends and outs of the case, the

11  accounting involved, the allegations, the motion to enforce

12  discharge, all of those things were after that point.

13      Q.   Well, as part of the context cases, was it

14  necessary for you to learn about the cases -- the ten cases

15  that were listed in the subpoena?

16                 MR. CONNOP:  Object to form.

17      A.   At some point, yes.

18      Q.   What point would that be?

19      A.   Without getting too much into what I believe would

20  be privileged information, the first order of business with

21  the 2004 Exams was whether the United States Trustee had
                                  them
22  standing to issue    That was the first issue I had to address

23  as in-house counsel.

24      Q.   Was one of the issues that you also had to address

25  whether these context cases were actually closed cases?

NATIONAL COURT REPORTERS (214) 651-8393

1   product.  You can answer that question, Mr. Townsend.  But if

2   we go further, you're getting into privileged areas.

3        Go ahead.

4        A.   I wanted to be kept in the loop, so to speak, of

5   what was going on in the Hill case.

6        Q.   And this email is an effort to do just that, keep

7   you in, in the loop?

8        A.   I'm not going to speculate as to Mr. McKeever's

9   purpose in sending it.

10        Q.   Do you know why Mr. Doby received a copy of this?

11        A.   I do not.

12        Q.   All right.  If you'll look at the second page.

13        Did you read this email -- you've answered that

14   question.

15        Take a look at the third paragraph on the second page

16   from Ms. Puida.

17        A.   It appears?

18        Q.   Yeah.  Can you read that for us?

19        A.   It appears that the discrepancy between

20   Countrywide's figures and the Trustee/debtor's figures are

21   payment changes that were sent to both counsel for the debtor

22   and the Trustee.  However, it does not appear that the

23   counsel for debtor or the Trustee made the necessary

24   adjustments to the payments being sent to Countrywide.

25        Q.   Was this the question -- in answer to a question

1      A.   I can't testify as to what her current title is.  I
2  believe at the time she was a first vice president.
3      Q.   And your understanding is she could settle a case
4  for Countrywide as a first vice president?
5           MR. CONNOP:  Object to form.
6      A.   I don't know.
7      Q.   Okay.  But based on that paragraph that we looked
8  at, if that were accurate, she could?
9           MR. CONNOP:  Object to form.
10     A.   I don't think that's what that paragraph states.
11     Q.   What does it say?
12          MR. CONNOP:  Do you want to show him what the
13  paragraph states?
14     Q.   Do you remember it?
15     A,   The answer to your question is, settlement
16  authority will vary upon dollar amount, as well.  And I don't
17  know what Ms. Lisa Middleton's dollar authority might have
18  been.
19     Q.   There are some instances where a first vice
20  president can settle, though; is that right?
21     A.   I don't know that, other than what you showed me in
22  that contract.
23     Q.   What was Bobbie Hook's position?  Do you know?
24     A.   I don't know.
25     Q.   Okay.  Were you involved in any way at this time,

1    on October 25th, 2007, October 24th, 2007, October 26th,

2    2007, with settling the Hill case, attempting to settle the

3    Hill case?

4        A.    No.

5        Q.    Okay.  So you had no participation whatsoever in

6    negotiations or setting parameters for settlement?

7        A.    I had no participation in negotiations or

8    parameters.

9        Q.    Now, are you aware that Ms. Middleton and Ms. Hook

10   found some problems with payment change letters that had been

11   forwarded to them that had originated with Countrywide and

12   came out through Leslie Puida?

13               MR. CONNOP:  Object to form.

14       A.    I'll leave it to you on problems.  I'm aware

15   there's an issue with the payment change letter.

16       Q.    All right.  Now, would you acknowledge that as of

17   October 26th, 2007 that Lisa Middleton knew that there was

18   problems with those payment change letters?

19       A.    I'm going to have to let the testimony of

20   Ms. Middleton and Ms. Hook speak for what it was.

21       Q.    Now, assuming they were telling the truth in their

22   testimony, the circumstance they faced, these letters being

23   not sent out, was that an unusual occurrence at Countrywide?

24               MR. CONNOP:  Object to form.

25       A.    I don't know.

1       Mr. Townsend, before we get to that exhibit, what

2  contact did you have with Ms. Puida prior to November 9th of

3  2007?

4       A.   I know that I had -- that I received emails from

5  her.  I may have even, in fact, replied to some of those

6  emails.  I do not recall whether there was telephone

7  communication.

8       Q.   Do you know approximately how many times you had

9  contact with her?

10      A.   No.  I'd be guessing.

11      Q.   Was the subject matter of those conversations the

12 Hill case?

13      A.   Yes, to the extent of whether a settlement had been

14 reached.

15      Q.   Okay.  And in those conversations -- excuse me, in

16 those communications, did she ever tell you about the issue

17 with the payment change letters?

18      A.   No.

19      Q.   Did she ever talk about the payment change letters

20 with you?

21           MR. MANNING:  I'm what was your answer to that

22 first question?

23           THE WITNESS:  It was, no.

24      Q.   Did she ever talk to you about the payment change

25 letters during that time?

1    resolved prior to the hearing scheduled on October 31st,

2    2007.

3         Do you see that?

4         A.   I do.

5         Q.   Okay.  CW is Countrywide, correct?

6         A.   Yes.

7         Q.   Is she asking you to provide settlement parameters?

8         A.   I can't testify as to what she's asking.  I do not

9    think she was asking me for settlement parameters.

10        Q.   Do you know who she was asking for settlement

11   parameters?

12        A.   I believe she was asking John Smith.

13        Q.   Okay.  Why would she send this to you and only

14   carbon John Smith, if you know?

15             MR. MANNING:  Object to the form.

16        A.   I can't explain why through reply to alls or

17   replies, whatever, people end up on whatever lines.

18        Q.   Okay.  So John Smith was authorized to provide

19   settlement parameters in this case?

20        A.   Yes.  I know that he was.

21        Q.   And do you know who authorized him to do that?

22        A.   No.

23        Q.   It was not you?

24        A.   No.

25        Q.   Okay.  If you look -- and it's pretty similar, the

1    email that we just went over was the one that was sent at

2    2:05 p.m.  There's one just below it that was sent a little

3    earlier, 11:55 a.m. from Leslie.

4         Did you read that email?

5         A.   I believe that I read it, yes.

6         Q.   And, again, it asks on the last line -- if you'll

7    look at the last line before, I will advise, starting with,

8    Can you provide me.

9         Can you provide me with general parameters of

10   settlement conditions that would be acceptable to CW, that

11   was not to you?

12        A.   I do not believe so.

13        Q.   Did you ever provide settlement parameters?

14        A.   Never.

15        Q.   To Leslie Puida?

16        A.   Never.

17        Q.   Did you ever provide settlement parameters to John

18   Smith to provide to Leslie Puida?

19        A.   Never.

20        Q.   So what -- when you had this information, what did

21   you do with it?

22        A.   Your hand is over the exhibit.

23        Q.   The information on the 26th that you received about

24   settlement parameters from Leslie Puida.

25             MR. CONNOP:  Object to form.

1   authorization to settle the Hill motion to enforce discharge;

2   is that correct?

3       A.   I mentioned it.  We talked about it.

4       Q.   Okay.  Did he, in fact, have that authority?

5       A.   I do not know.

6       Q.   Who, if you do know, had any input into the

7   settlement of the Hill case during the time period that we're

8   talking about, March to December 20th of '07?

9       A.   Who had any input into the discussions?  What part?

10      Q.   Who had any input?  Who had any ability to in any

11  way influence the settlement?

12              MR. CONNOP:  Object to form.

13      A.   I don't know what you mean by influence.

14      Q.   Let me ask you this.  Did you have to approve the

15  settlement?

16      A.   I did not have to approve the settlement.

17      Q.   Did Locke Lord have to approve the settlement?

18      A.   Locke Lord did not need to approve the settlement.

19      Q.   Did you have to be informed of any settlement?

20      A.   No, I did not need to be informed of any

21  settlement.

22      Q.   Did Locke Lord have to be informed of any

23  settlement?

24      A.   No.  Locke Lord did not need to be informed of any

25  settlement.

1    What does that mean, exhaustively?

2       A.    Well, at that time my belief was Mr. Smith had at

3    least $25,000 in settlement authority.  So I  knew he could

4    settle the case.  I don't know what anybody else had up or

5    down from him and, therefore, can't comment.

6       Q.    Now, Mr. Smith learned, you've acknowledged, of the

7    payment change issue on December 12th, 2007.

8                    MR. CONNOP:  Object to form.

9       A.    I'll let his deposition speak for itself.  I don't

10   recall what the date was.

11      Q.    But you were -- you know, you've been around during

12   the depositions, documents.

13       The sounds about right to you, doesn't it?

14                    MR. CONNOP:  Are you making the definitive

15   representation to this witness that Mr. Smith made that

16   statement as to that date, Mr. Layng?  Because if you are, I

17   will hold you to that.  Because that representation is no

18   less misleading than anything that you're pointing to.  So if

19   you want to make that representation here, go ahead.    We'll

20   rely on that representation.

21                    MR. LAYNG:  All right, Mr. Connop.

22                    MR. CONNOP:  No.  You've made -- you've made

23   repeated representations in these depositions to other

24   witnesses, specifically the representation you made to Leslie

25   Puida about testimony from Lisa Middleton.  I won't stand for

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ) | |
| ) | |
| SHARON DIANE HILL, ) | Case No. 01-22574 |
| ) | |
| Debtor. ) | Chapter 13 |
| ) | |
| ‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑ ) | Related to Document Nos. 562, 570 |
| ) | |
| GOLDBECK McCAFFERTY & McKEEVER ) | |
| AND LESLIE PUIDA, ESQUIRE, ) | |
| ) | |
| Movants, ) | |
| ) | |
| Vs. ) | |
| ) | |
| ROBERTA A. DEGANGELIS, acting United ) | |
| States Trustee for Region 3, ) | |
| ) | |
| Respondent. ) | |
| ) | |
| ) | |

## NOTICE OF SERVICE OF TRIAL EXHIBITS

Goldbeck McCafferty & McKeever and Leslie Puida, Esquire (collectively the "Firm") file this Notice to advise that by overnight courier on Tuesday, November 16, 2010, they served the Court; Norma Hildenbrand, Esquire, counsel for the UST; Thomas Connop, Esquire, counsel for Countrywide; and Richard Parks, Esquire, counsel for Charles Townsend, with a

notebook containing the exhibits that the Firm may introduce at trial on November 22, 2010.

Respectfully submitted,

s/Andrew F. Gornall
Michael T. McKeever
I.D. No. 56129
Andrew Gornall
I.D. No. 92382
4 Penn Center West – Suite 122
Pittsburgh, PA 15276

Jeffrey A. Lutsky (admitted *pro hac vice*)
I.D. No. 36673
Francis X. Manning (admitted *pro hac vice*)
I.D. No. 58052
Stradley Ronon Stevens & Young, LLP
2600 One Commerce Square
Philadelphia, PA 19103-7098
Attorneys for Goldbeck McCafferty & McKeever
and Leslie Puida, Esquire

2

## CERTIFICATE OF SERVICE

    I, Francis X. Manning, hereby certify that on the 17th day of November, 2010, I

served a true and correct copy of the foregoing via electronic mail upon the following:

Norma Hildenbrand, Esquire
United States Department of Justice
Office of the United States Trustee
1001 Liberty Avenue, Suite 970
Pittsburgh, PA 15222
Email: Norma.L.Hildenbrand@usdoj.gov

Dorothy A. Davis, Esquire
Eckert Seamans Cherin Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
412.566.5953 (direct)
412.566.6099 (fax)
412.973.5969 (cell)
ddavis@eckertseamans.com

Patrick Layng, Esquire
Regional Coordinator
U.S. Trustee's Program
219 S. Dearborn Street, Suite 873
Chicago, IL 60604
Email: Pat.S.Layng@usdog.gov

Thomas A. Connop, Esquire
Locke Lord Bissell & Liddell, LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
tconnop@lockelord.com

Lisa Tingue, Esquire
U.S. Department of Justice
Office of the U.S. Trustee
Western District of PA
Liberty Center, Suite 970
Pittsburgh, PA 15222
Email: Lisa.D.Tingue@usdoj.gov

Richard J. Parks, Esquire
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
One Oxford Centre
38th Floor
Pittsburgh, PA 15219
Email: rjp@pietragallo.com

Francis X. Manning

# 1267931  v. 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| SHARON DIANE HILL | ) | Case Number 01-22574 JAD |
| Debtor, | ) | Chapter 13 |
| | ) | |
| ROBERTA A. DeANGELIS, | ) | Related to Doc. No. 560 and 570 |
| Acting United States Trustee | ) | |
| For Region 3, | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTRYWIDE HOME LOANS, | ) | |
| INC., GOLDBECK, McCAFFERTY | ) | |
| AND McKEEVER, and | ) | |
| ATTORNEY LESLIE PUIDA | ) | |
| Respondents | ) | |

## CERTIFICATE OF SERVICE

I, William Pietragallo, II, Esquire, hereby certify that a true and correct copy of the within Proffer of Anticipated Testimony of C. Charles Townsend, has been forwarded to the parties named below on this 17th day of November, 2010 via electronic mail and United States First Class Mail, Postage Prepaid:

Respectfully submitted,

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

/s/ William Pietragallo, II
William Pietragallo, II, Esquire
PA I.D. #16413

15

wp@pietragallo.com
Richard J. Parks, Esquire
PA I.D. #40477
rjp@pietragallo.com

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP.

One Oxford Centre
38TH Floor
Pittsburgh, PA  15219
(412) 263-2000

*Attorneys for C. Charles Townsend*